WASHBURN et al. v. NATIONAL WALL-PAPER CO. et al.

(Circuit Court of Appeals, Second Circuit. May 26, 1897.)

No. 109.

1. CORPORATIONS—ISSUANCE OF STOCK FOR GOOD WILL OF BUSINESS.
   The good will of a business is property, and may have a value independent of any particular locality or any specific tangible property, and stock of a corporation issued for such good will is issued for property actually received, within the meaning of the New York stock corporation law (Laws 1892, c. 688).

2. SAME—OVERVALUATION—ESTOPPEL.
   One who has sold the good will of his business to a corporation for certain shares of its stock, and has participated in and approved the method of valuation of such good will for the purpose, cannot afterwards claim that the good will so bought by the corporation was overvalued.

3. SAME—DEPRECIATION—EVIDENCE.
   When the stock of a corporation has been issued for the good will of several separate business establishments, and it is claimed that the value thereof has depreciated, the court cannot determine that it has, in the absence of positive evidence of the value of such good will at the time of the issue of the stock and at a later time, and the fact that some of the establishments have been closed while their customers are supplied by the product of other establishments does not prove a depreciation.

This is an appeal from a decree of the circuit court, Southern district of New York, dismissing the bill.

The suit was brought by complainants, who are large owners of the stock of the defendants, the National Wall-Paper Company, to restrain the payment of interest upon certain obligations of the company called "debenture stock." The complainants insisted that such payment was not justified by the terms of the debenture stock itself, but was in violation of the agreement between the company and the complainants, and of the provisions of the articles of association and by-laws of the company. The company's president and treasurer were joined as defendants.

The defendant company was organized June 2, 1892, under the New York business corporation law, to carry on the business of manufacturing and dealing in wall paper, with a capital stock originally of $14,000,000, but which was soon increased to $30,000,000, all of which, however, has not been issued. The certificate of incorporation provided for the creation of obligations in the nature of certificates of indebtedness to the extent of $8,000,000, to be known as "debenture stock," and sold for cash or for property or assets purchased by the corporation at the fair market value thereof. It further provided that: "The debenture stock hereby authorized to be issued shall be and remain an obligation of the corporation, or payable at the expiration of the corporate existence, and entitled meantime to interest at a rate not exceeding eight per cent. per annum, payable quarter-yearly, as an expense of the business, from and out of the profits of the company, before any dividend can be declared or paid on the stock or share capital. No payment of interest can or shall be made on such debenture stock which will impair the capital, nor unless the amount paid shall have been actually earned by the company. The holders of debenture stock shall not be entitled to demand or sue for the interest payable upon the obligations held by them unless such interest was actually earned by the company, in which event the amount earned shall be distributed amongst and paid to the holders of debenture stock, to the proportion of their holdings, but the unpaid interest shall, notwithstanding, become and remain an obligation of the company, payable out of any future profits to the full extent of the amount represented by the outstanding certificates before any dividends can be declared or paid on the stock or share capital. In the event of the dissolution or winding up of the company, the holders of debenture stock or of certificates representing the ownership thereof shall rank pari passu with other

unsecured creditors of the corporation, and shall be entitled to receive in full out of the assets of the company the amounts represented by the outstanding certificates of indebtedness or debenture stock in priority to the claims of the shareholders to be paid any amount in respect of such shares." The by-laws provided that the board of directors shall select accountants as official auditors to the company, who shall supervise its books of account, and all interest paid upon the debenture stock, and all dividends declared on the share capital, shall be based upon the net earnings of the company as certified by such auditors. Each certificate of debenture stock contained the following provision: "Each of the shares of debenture stock represented by this certificate is entitled to receive interest at the rate of 8 per cent. per annum, payable quarter-yearly on the first days of September, December, March, and June in each year, from and out of the profits of the company before any dividend can be declared or paid on the stock or share capital; but no payment of interest can or shall be made on such debenture stock which will impair the capital, nor unless the amount paid shall have been actually earned by the company. In event of default in payment of the interest on the debenture stock represented by this certificate, the unpaid interest shall become and remain an obligation of the company, payable out of any future profits to the full extent of such unpaid interest before any dividend can be declared or paid on the stock or share capital. In the event of the dissolution or winding up of the company, the holders of debenture stock shall rank pari passu with other unsecured creditors of the corporation."

At the time of the organization of the company the appellants, constituting the firm of Cresswell & Washburn, were manufacturers and dealers in wall paper under the firm name of Cresswell & Washburn. Other firms and individuals were engaged in like business in various parts of the country. These various concerns commenced negotiations with the National Wall-Paper Company, which resulted in the acquisition by the latter of the property and assets of the several concerns, including complainants' firm of Cresswell & Washburn. All these acquisitions took place under separate contracts in substantially the same form, which contained these provisions: (1) "The value of the fixed plant, machinery, fixtures, chattels, merchandise, book accounts, and other assets hereby transferred shall be fixed by * * * the appraisers." (2) "There shall be issued to the vendors, in payment for the property and assets acquired hereunder, the obligation of the company in the nature of one or more certificates of indebtedness to be known as 'debenture stock' in an amount equal to the appraised value of the property and assets hereby transferred, such appraised value to be fixed in the manner hereinbefore provided," etc. (3) "There shall be further issued and paid to the vendors for the good will of the business thereby transferred, and in consideration of the execution by them of this agreement, and of the further contracts assuring the continued good will of such business to the company, * * * an amount of common stock equal at par to sixteen times the net earnings of the vendors in their business for the eleven months commencing July 1, 1891, and ending May 31, 1892, less the appraised value of the property to be transferred to the company; but the issue of such common stock shall be subject to the conditions and restrictions hereinafter contained, viz. [that vendors should deposit their stock in a voting trust]." (4) "For the purpose of fixing the amount of the common stock of the company to which the vendors shall be entitled * * * as payment for the good will of the business so to be transferred, and for the assurance of such good will to the company," the agreement provided for an ascertainment of profits for the 11 months from July 1, 1891. (5) The vendors guarantied the collection of the accounts and bills receivable transferred by them. In case of any failure of collection, the vendors were to surrender back to the company debenture stock equal at par to the face value of the uncollectible amount, "and also an amount of stock equal at par to sixteen times the face value of such uncollected book accounts and bills receivable, less the amount of debenture stock returned." The vendors further covenanted with the company that they would, neither directly nor indirectly, engage in the business of manufacturing, buying, or selling wall paper. If they did, they were to forfeit to the company all the stock issued to them. In valuing good will, patents, copyrights, and trade-marks were to be regarded as part of the

good will. These, however, were relatively insignificant. There is criticism, supported by testimony, of the manner in which the profits of the respective concerns for the specified 11 months were ascertained, but it is not necessary to set forth the details; the figuring was all done by the same accountants, and the methods were alike in all the cases.

The stock corporation law (Laws 1892, c. 688), § 42, provides: "No corporation shall issue either stock or bonds except for money, labor done, or property actually received for the use and lawful purposes of such corporation. No such stock shall be issued for less than its par value; no such bonds shall be issued for less than the fair market value thereof." It will be perceived from the foregoing statement that the stock of the defendant company was issued for the "good will" of the different manufacturing plants (and some patents, trade-marks, etc.), the tangible assets of which plants, viz. machinery, fixtures, material, book accounts, etc., were paid for by the issue of the debenture stock. Practically the entire capital stock (i. e. the common stock) is represented by the good will of the establishments which the defendant company bought up. Complainants received for their old plant, book accounts, good will, etc., $326,000 in debenture stock, and $1,831,800 in common stock, of which, by reason of the uncollectibility of certain accounts, they subsequently returned $7,702.19 of debenture stock and $135,200 of common stock. When the suit was begun, the accountants, designated under the by-laws as auditors, had made no certificate of net earnings. Subsequently, and on April 22, 1896, they certified that they had examined the books and accounts from the date of inception to February 29, 1896, and found the net profits for the entire period to be $3,046,639.66. They further certify that "the surplus profits remaining on hand on said 29th day of February, 1896, representing the net earnings of the company available for the payment of interest on its debenture stock, over and above the sums already expended for interest, amount to $1,410,522.39." This sum so certified is $866,528.29 in excess of the debenture interest unpaid and claimed to be accrued on February 29, 1896; i. e. for 11 months at 8 per cent. per annum, viz. $543,994.

E. M. Shepard, for complainants.

Louis Marshall, for defendants.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts). The contention of the complainants is that, notwithstanding the certificate of the auditors, no debenture interest could be paid without impairing the capital of the company, and that in fact there were no profits. They contend that they have demonstrated the impairment of the capital stock to an extent more than sufficient to prevent the payment of debenture interest: First, on the theory that the capital stock was originally issued for far less than its par value, and has never been fully, if at all, paid; second, on the theory that, even if it were originally fully paid, there has been an enormous depreciation in the value of the capital stock since that time; third, by losses and depreciations in assets other than the good will for which the capital stock was originally issued.

The first of these propositions suggests the questions whether stock is issued for "property actually received," within the meaning of the statute, when it is issued for good will only; and whether, assuming that the entire stock could, under the New York act of 1892, be issued solely for good will, the good will taken in this case was taken at its actual value. These questions are discussed at great length in the briefs. It is contended that, although "good will" is property in the sense that it is a subject of bargain and

sale, it is nevertheless but a so-called "parasitical species of property, which cannot exist apart from the substantial property of which it is an attribute"; that it is not a thing of value by itself; that the capital of a corporation must be invested in property capable of existence by itself; that in this case no effort was made to ascertain the actual value of the good will; that the value at which it was appraised and stock issued against it was purely arbitrary, and in no sense a proper valuation, and that in determining this arbitrary valuation elements of alleged profits were taken into consideration, which could not fairly be considered such. Upon this interesting, and possibly perplexing, discussion we do not find it necessary to embark. Good will has been defined as "all that good disposition which customers entertain towards the house of business identified by the particular name or firm, and which may induce them to continue giving their custom to it." There is nothing marvelous or mysterious about it. When an individual or a firm or a corporation has gone on for an unbroken series of years conducting a particular business, and has been so scrupulous in fulfilling every obligation, so careful in maintaining the standard of the goods dealt in, so absolutely honest and fair in all business dealings that customers of the concern have become convinced that their experience in the future will be as satisfactory as it has been in the past, while such customers' good report of their own experience tends continually to bring new customers to the same concern, there has been produced an element of value quite as important—in some cases, perhaps, far more important—than the plant or machinery with which the business is carried on. That it is property is abundantly settled by authority, and, indeed, is not disputed. That in some cases it may be very valuable property is manifest. The individual who has created it by years of hard work and fair business dealing usually experiences no difficulty in finding men willing to pay him for it, if he be willing to sell it to them. Legislation devised to restrict the accumulation of the fruits of industry may impair its value by denying to its producer the right to enter into a contract enforceable at law not to interfere with its enjoyment by the purchaser, but, so long as any belief in human honesty remains, there will be found some persons willing to buy such property, the very existence of which implies honest business dealing in the past. And so long as it remains salable it is valuable. Nor is it indissolubly connected with any particular locality, or any specific tangible property. Reference has been made on the briefs to the publishing house of "Harper & Bros." If its present establishment in Franklin Square were destroyed by fire to-morrow, and everything therein contained were swept out of existence, it is surely manifest that, so long as the firm itself survived, and continued to transact its old business, it would still hold its "good will," although the business should be thenceforward conducted in a new building erected on some uptown street, and supplied with entirely new machinery and equipments. If good will be a "parasite," it is a "parasite" of the business from which it sprung, not of the mere machinery by which that business was conducted.

Since good will is property, and since in some cases it is valuable property, it would follow that in some way or other it must be practically possible to determine what that value is. Whether the particular method employed in the case at bar to ascertain such value is or is not a proper one, and whether the appraisement made when these several wall-paper concerns were bought up by the defendant company was accurate, we are under no obligation to inquire upon the complainants' request. The method of valuation was one which they fully approved, and which was applied in fixing the value of their own property, as the result of which they received $1,831,800 in common stock of the defendant. They certainly, participating in the transaction, and reaping its benefits, are in no position now to claim that the good will bought by the defendant company with common stock was overvalued.

The second proposition which has been discussed at great length in the briefs of counsel is the one advanced on behalf of complainants, viz. that, "even if the capital stock were originally fully paid, there has been an enormous depreciation in the value of the capital stock since that time." We do not find it necessary to review the discussion of this question as to what constitutes depreciation of capital, within the meaning of the statute and articles of incorporation. The defendants insist that "in determining whether a company is entitled to pay a dividend, the property acquired for permanent use in carrying on business may be valued at the price actually paid for it, although it could not be sold again except at a loss." Complainants' counsel controverts this proposition; but, even if complainants' contention be sound, the result here would be the same. There is an insuperable practical difficulty in the way of deciding whether or not there has been depreciation in the capital of defendant company, or in so much of the assets as represent good will. The case discloses no evidence advising us what the good will of these various concerns bought by the defendant company was worth on the day of purchase and what it was worth on February 29, 1896. With absolutely no information as to either minuend or subtrahend, we cannot make any determination as to what the difference may be between them. This court is advised of no rule or method of appraisal which can be applied to such facts as are in proof in order to determine the value of this asset at either time. The evidence is not entirely persuasive that the rule adopted when the properties were purchased is the true one; and the mere circumstance that complainants, who profited by that valuation, cannot now be heard to question its accuracy, does not make it so. No estimate or appraisal as of either date is testified to, no experts have made calculations, and rehearsed the results thereof. The fact that some of the workshops bought by the defendant company have been closed and dismantled, the business of selling goods to the customers of the concerns who formerly owned such shops being still carried on, does not dispose of the question. Even if the good will of such concerns has ceased to exist (which is by no means certain), it does not follow that the entire value of the good will of all the properties has depreciated. It may be that the disappearance of these concerns from the field has increased

the value of the business of such as are left. It is manifest that any conclusion as to this branch of the case would be but surmise based upon conjecture, and without definite information as to the actual value of this asset this court cannot undertake to say whether or not it is less than it was four years ago.

Complainants further contend that on February 29, 1896, there were not profits sufficient to warrant the payment of interest on the debenture stock, such interest concededly being payable only out of profits. This interest, it will be remembered, amounted to $543,994, and the auditors certified that the profits on that day aggregated $1,410,522.39. It is insisted that certain items of assets were taken by the auditors at an excessive valuation, that in some cases items not properly assets were included on the credit side of the account, and that sufficient sums were not deducted for depreciation, reserves, etc. These items are:

| | |
|---|---:|
| Birge good will | $2,100,000 00 |
| Birge bonus | 300,000 00 |
| Addition to Block account | 100,000 00 |
| Selling expenses treated as an asset | 166,050 17 |
| Reserve for depreciation | 300,000 00 |
| Reserve for bad debts of business of 1892 to 1894 | 50,000 00 |
| Reserve for bad debts of business of 1894 to 1896 | 150,000 00 |
| Eight per cent. for valuation of manufactured goods | 60,000 00 |
| | $3,226,050 17 |

The first two items may be considered together. About the time when complainants sold their business to the defendant company, in 1892, some effort seems to have been made to buy up the establishment and business of the firm of M. H. Birge & Sons, of Buffalo, upon the same terms as all the others, but Birge & Sons refused to entertain the offer. Subsequently, in December, 1894, a fire destroyed part of the Birge plant at Buffalo. Thereupon defendant company, apparently with a view of ingratiating itself with the firm, offered to lease it one of the defendant's factories, which was temporarily shut down. Negotiations for the purchase of the entire Birge business and outfit were subsequently begun, and finally Birge made an offer to sell at a certain price, leaving his offer open for but a brief period. It was accepted, although not without disapproval by a minority of the board of directors, including complainant Washburn. The price agreed upon was $300,000 in cash on the day of signing the contract, $2,100,000 in common stock, $50,000 in debenture stock, and an additional sum in cash, to be paid when appraisement of the tangible assets was completed, and which turned out to be $129,286.36. The auditors treated this transaction as a purchase of assets for permanent investment, and $2,400,000 of it as paid for good will and patents. This is a strictly accurate statement of the transaction, and the only possible objection to the auditors' figuring is the suggestion that the good will and patents were not worth $2,400,000, either when bought, in February, 1895, or when counted as an asset, in February, 1896. Here, again, the question is presented, what is the actual value of this property? But the record gives us no information upon which to answer. It is urged on behalf of

defendants that Birge & Sons were a well-known house, which had been in existence for over 40 years, and were most favorably known throughout the entire western part of the state of New York; that their annual business largely exceeded $1,000,000; that their profits for the three years preceding the purchase (including the disastrous years of 1893 and 1894) amounted to from $175,000 to $225,000 a year; that they were the owners of a number of patents of great utility in the manufacture of wall paper, and 147 design patents; that Mr. Birge, the head of the house, was a man in the prime of life, active, energetic, of high business capacity, with a thorough understanding of the wall-paper business, and one of the strongest and most dangerous competitors of the defendant company. The president of defendant company testified that he considered the property well worth what was paid for it, that it was an extremely valuable business, and that he still considers it one of the best purchases the company ever made. On the other hand, the complainant Washburn expressed the opinion that the price paid for it was extravagant, although he would have been willing to buy it on the same terms as the other plants, and that the patents were not of much, if any, value. This is practically all the testimony we have from which to determine at what figures the auditors should have set down the property represented by the Birge patents and good will. Evidently the majority of the board of directors supposed it was worth the price paid, or they would not have paid it. It would seem to require affirmative evidence to discredit their conclusions. It is suggested in the brief that "$2,100,000 is a large amount of money." So, too, is $1,800,000, and it is quite apparent from this record that a long-established and well-known concern engaged in this business represents much more value than is to be found in its real estate, factory outfit, goods, and credits. Certainly it was something of value which enabled complainants in the face of active competition to make a net profit of over $110,000 in 11 months out of a plant worth considerably less than $320,000. Reference is made to the statement of the president on direct examination that the price paid for the Birge property was reached "arbitrarily." It is evident from the rest of his testimony, however, that what he meant was that the rule used in other cases, viz. the difference between tangible assets and 16 times the net profits, was not applied. Upon the testimony as it stands, we cannot find that the auditors erred in treating the Birge good will and patents as an asset worth what the company paid for it.

It will not be necessary to review the other items objected to in the auditors' balance sheet. As to some of them—e. g. the "addition to block account" and the "selling expenses"—the testimony seems to sustain the action of the auditors. But further discussion is unnecessary. Eliminating the two Birge items, it will be found that the others objected to aggregate $826,050.07, but the balance sheet gives a surplus over and above the debenture interest of $866,-528.39; so that, whatever conclusion should be reached as to these other items, there would be sufficient profit to pay the interest, and complainants are not entitled to enjoin such payment.

It is contended that complainants should not have been required to pay costs, on the theory that "there was ground for the suit when brought." Manifestly, under the by-laws, there was no authority for paying debenture interest until the auditors had certified that there were sufficient profits. No such certificate had been made when the suit was brought in June, 1895, nor was a sufficient certificate made until April, 1896. But the evidence does not warrant a finding that the company or its officers had any intention of paying the interest in advance of the certificate. The president expressly denies the charges of the bill to that effect. Under these circumstances we see no reason to disturb the conclusion of the circuit court. The decree appealed from is affirmed, with costs of this appeal.