## BROWN *v*. WEEKS.

1. CORPORATIONS—CREDITOR'S SUITS—LIABILITY OF STOCKHOLDERS—SUBSCRIPTIONS TO STOCK—FRAUD—EVIDENCE.

In an action by creditors of an insolvent corporation to enforce payment for stock subscribed, the defense of fraud and misconduct on the part of the incorporators, *held*, wholly unsupported by the evidence.

2. SAME—STOCK AND STOCKHOLDERS—FRAUD—PRESUMPTIONS.

The issuance of stock in a corporation in consideration of property will be presumed free from fraud unless the contrary clearly appears.[1]

[1]The question of bonus stock of corporations is taken up in note in 38 L. R. A. 490, particularly as to rights of creditors, see page 494 of same note.

3. SAME—STOCK AND STOCKHOLDERS—GOOD WILL AS PROPERTY.
   The good will of a business, though intangible, is property
   for which the stock of a corporation may be issued under
   statutes allowing stock to be paid for in property.

4. SAME—STOCKHOLDERS' LIABILITY—JOINT LIABILITY—TRUSTEE.
   Where the evidence in said suit showed that one stock-
   holder subscribed for preferred stock as trustee for all of
   the incorporators, the court below properly held that all
   were jointly liable.

5. SAME—PATENTS—TRADE-MARKS—PROPERTY SUBJECT TO EXECU-
   TION—STATUTES.
   Since patents, trade-marks, and good will are sold under
   process of the chancery courts, they must be held to be
   property subject to levy and sale on execution or "other
   process" under the provisions of section 2, Act No. 146,
   Pub. Acts 1907 (2 Comp. Laws 1915, § 9018), describing
   property that may be taken in payment for capital stock.

Appeal from Kent; McDonald, J. Submitted Octo-
ber 6, 1916. (Docket No. 59.) Decided March 29,
1917.

Bill by George C. Brown, trustee in bankruptcy
of the Coronet Corset Company, against Eugene J.
Weeks, Cornelius Kelly and others for a decree en-
forcing certain unpaid stock subscriptions. From the
decree entered, plaintiff and defendants Weeks and
Kelly appeal. Affirmed.

*Rolland J. Cleland* and *George C. Brown,* for ap-
pellant Brown.

*Kleinhans, Knappen & Uhl,* for appellant Weeks.

*Clapperton, Owen & Hatten,* for appellees Jarvis,
Wright, Joslin, Knott, and Conger.

*Hatch, McAllister & Raymond,* for appellees Frick
and Stowe.

*Smedley & Linsey,* for appellees Otte, Mitts, and
Thiele.

STONE, J. The bill of complaint herein was filed against the defendants as stockholders and incorporators of the Coronet Corset Company, bankrupt, to enforce their alleged unpaid stock subscriptions, and to compel them to pay a sufficient sum to liquidate the unpaid portion of the debts allowed against said bankrupt, in the bankruptcy proceedings.

As stated by complainant, the controversy centers chiefly around the questions whether the incorporators actually turned in for common stock the property stated in the articles to have been so turned in; whether such property, if actually turned in for common stock, was of the kind permitted by the statute, and was sufficiently itemized and the valuation of each item given; and whether there was actual fraud in the valuation of such property, if the statute was otherwise complied with.

The Coronet Corset Company of Grand Rapids, Mich., was incorporated on December 17, 1909, under Act No. 232, Pub. Acts 1903, and amendments (2 Comp. Laws 1915, § 9017 *et seq.*); its articles being duly recorded in the office of the secretary of State and of the county clerk of Kent county.

The case being at issue as to all of the defendants except Edward C. Weeks, the bill was dismissed as to him.

The learned circuit judge who heard the case, and heard and saw all of the witnesses testify therein, filed a written opinion as the basis of the decree entered below. After a thorough examination of the record and the numerous briefs, we are of opinion that the circuit judge reached the correct conclusion in the case upon the several issues raised; and we are so well satisfied with the statement of the case by him that we insert the opinion here. It is as follows:

"This action is brought by George C. Brown, as trustee in bankruptcy of the Coronet Corset Company, to recover certain assets of the bankrupt.

"The Coronet Corset Company of Grand Rapids was incorporated December 17, 1909, with an authorized capital stock of $150,000, divided equally into common and preferred, of the par value of $10 a share. The articles of association represent that of the preferred stock $50,000 was subscribed and paid for as follows: $44,000 in cash and $6,000 in property. The common stock was all subscribed for by the defendant Holden Joslin, and was paid for in property valued at $75,000. One-half of this stock was turned back to the company by Joslin with the understanding that it should be issued to subsequent purchasers of preferred stock at par, as an inducement to the sale of that stock. The details of this arrangement were that subscribers to preferred stock should receive, without additional cost, 50 per cent. of amount of their subscriptions in common stock. The property turned into the corporation by Joslin in payment for the common stock consisted of all the tangible and intangible assets of the Coronet Corset Company of Jackson, Mich., and of the P. Schultz & Company of Hastings, Mich.

"It is the theory of the bill of complaint that this property was intentionally and fraudulently overvalued, and that the general scheme of the organization was carried on in pursuance of a conspiracy to defraud the public and creditors. The liability of all the defendants is based on the alleged fraudulently excessive valuations with an additional liability on the part of the defendant Jarvis for $1,500 of unpaid preferred stock subscriptions, and on the part of defendant Eugene J. Weeks and Edward C. Weeks for transferring their stock after debts had been contracted and with the knowledge of the failing condition of the business, and with the intention of escaping liability.

"The charges of fraud and misconduct on the part of the incorporators of this company are wholly unsupported by any evidence. I am not able to say from the evidence whether there was any very extravagant valuation placed on the property which was turned in by Mr. Joslin to pay for the common stock; but I am satisfied that, if there was, it was due to an honest error in judgment induced by an apparently well-founded enthusiasm as to the ultimate success of the business. It was at least a good faith valuation. I therefore find that there was no fraud in fact or in

law, and that therefore no liability attaches to any of the organizers of the corporation because of the valuation placed upon the property for which the common stock was issued.

"Neither is there any evidence of conspiracy or unlawful purpose in the promotion and organization of the company. And, if there was no fraudulent overvaluation of the property, the common stock was fully paid, and, as it belonged to Mr. Joslin, he had a right to sell it or give it away as he pleased. It follows that there can be no recovery from any of those defendants who purchased preferred stock and received therewith, without cost, 50 per cent. of the amount in common stock.

"As to the claim of $1,500 against the defendant Jarvis, who subscribed for the amount of preferred stock and did not pay for the same, I am of opinion that the liability for the payment of this unpaid subscription should be shared by all the other incorporators. It affirmatively appears from the evidence that, when Jarvis subscribed for the $1,500 additional amount of preferred stock, he was acting for all of the incorporators and made the subscription at their request in order to make up the $50,000 for the preferred stock. It was not intended that he should pay for it, and it was in fact subsequently returned to the treasury and with their consent. As I said, the testimony shows that Jarvis subscribed for this stock to make up the $50,000 which the articles of association represented to have been paid in for the preferred stock. After the organization, he surrendered this stock with the consent of the company; but such surrender did not relieve him of liability. He is liable for the subscription, but, under the circumstances, I think that the other incorporators should be required to share the responsibility with him and make good the amount of this subscription. I therefore find that all of the incorporators are jointly and severally liable for the payment of the amount subscribed by Mr. Jarvis, as trustee.

"As to the claim that the Hastings business which was practically owned by Walter H. Wright, was transferred subject to a credit of $1,225, the original arrangement seems to have been that Mr. Wright was

to have such a credit on his preferred stock subscription; that being the estimated value of the raw and manufactured stock of his company. When the articles of association were made, however, no mention was made of the credit of $1,225 to Mr. Wright; so that in fact the assets of the Hastings Company were turned in free from any incumbrance. Subsequently, some one acting without authority included this amount of $1,225 in a check for Mr. Wright's manufactured stock. Wright immediately turned it back in partial payment of his preferred stock subscription of $5,000. As he was not entitled to the $1,225 credit, to that extent his preferred stock subscription is unpaid. I therefore find that Walter H. Wright is liable for $1,225 due on his preferred stock subscription.

"As to the liability of the defendants Eugene J. Weeks and Edward C. Weeks for transferring their stock to parties in Montana with the intention of escaping liability, I find that when the transfer was made the defendants Weeks did not know that the bankrupt was in a failing condition, and that they did not make such transfer with a view to escaping liability on the stock.

"Having found that there was no fraud in the organization of the company and that Joslin was the owner of common stock, which was fully paid, it follows that no liability attaches to defendants Stowe, Thiele, Frick, Conger, Kelsey, and Forrester, and as to them the bill should be dismissed.

"The defendants Jarvis, Eugene J. Weeks, Edward C. Weeks, Wright, Knott, Joslin, Mitts, Otte, and Kelly, are jointly and severally liable for the payment of $1,500 on the preferred stock subscribed by Jarvis.

"In view of the character of my conclusions of fact, it is not necessary to pass upon the questions of law which were so ably briefed by counsel.

"All the creditors are entitled to participate.

"A decree will be entered in accordance with these findings."

The plaintiff has appealed.

A few facts in support of the above should be stated:

This Grand Rapids corporation was organized by combining the business of the Coronet Corset Com-

pany of Jackson and of Walter G. Wright under the
name of P. Schultz & Co. of Hastings, under options
some time before given to defendant Holden Joslin.
The Jackson company had been organized by defend-
ant Eugene J. Weeks, and had been actively operating
for 25 or 30 years, and its business had been profit-
able from the beginning. It had a thoroughly equipped
plant, including upwards of 170 sewing machines
(many of them multiple needle machines), a printing
plant including its own stereotype for making plates,
etc., a cylinder press, a steel plant including a method
for a secret process of water proofing corset steels,
and machinery especially built therefor; a thoroughly
equipped machine plant and an organization for build-
ing new machines. It was thoroughly equipped with
work tables and had about 100 of what were termed
highly accented machines for special work, as well as
the regular machines. The plant had a capacity of
100 dozen corsets a day. It printed its own labels and
advertising matter. It was doing a business of up-
wards of $100,000 a year, and in some years it had
gone as high as $175,000. It had developed a large
number of trade-marks and brands for its products.
In the fall of 1909 when this sale was made, it was
using actively in its business about 12 of these trade-
marks. They had all been well and extensively ad-
vertised, and thousands of dollars had been expended
in advertising and pushing these brands. Two of the
brands had been demonstrated extensively at large
expense throughout New England and the Middle
West. Among the brands so demonstrated was the
"Flexo-Waldo," a front lace corset, at that time be-
coming very popular, which was being extensively
pushed, advertised, and demonstrated in 1909 and the
years just prior thereto. The company owned pat-
ents and had a large list of customers.

Defendant Eugene J. Weeks, in the fall of 1909, was the president and general manager of the Jackson business and company. Prior to this time his sons, who had been with him for years in the business, had engaged in business abroad, so that he had neither son to look forward to, to supplement or assist him in the business. He was 68 years of age, and was wealthy and anxious to retire from active business. It was in evidence and undisputed that these patents, trade-marks, and customers' lists, and the large amount of advertising that had been done during the past 25 years were of the value of many thousands of dollars to a going concern such as the Jackson company was. The secret process for making the corset stays was also worth thousands of dollars. The tangible assets of the company consisted of factory equipment, inventorying about $24,000, goods and raw stock valued at $17,479. It also had on hand orders for corsets to the amount of $20,000. It was an active, going business concern, with a large volume of business and operated at a profit.

The Hastings concern was also an active, going one, manufacturing corset accessories, including brassieres, bust forms, hip pads, etc., and had been in the business at Hastings for about five years. Although its capital was limited, it was doing a business of from $10,000 to $20,000 a year. It sold its product all over the country from New York to San Francisco. The business was capable of very great expansion with sufficient capital to push it. It not only had an established trade throughout the country, but it also had various trade-marks and names that had become generally known and were of great value. It also had patents and customers' lists which were valuable.

The inception of the plan which finally resulted in bringing these two businesses to Grand Rapids, and uniting them in one company, was the offer of Mr.

Weeks to Mr. Joslin to sell the Jackson concern to him. The latter had been with the Jackson concern 15 or 16 years and enjoyed the confidence of Mr. Weeks. In the summer of 1909, Mr. Weeks suggested to Mr. Joslin that he would like to get out of the business and that the latter might be able to organize a corporation to take the business over. He told Joslin that, if he could succeed in organizing such a corporation, he would give him a special advantage by selling out the entire business, exclusive of manufactured and raw stock and book accounts, for one-quarter of the value of the machinery and equipment, Mr. Joslin to take over the manufactured and raw stock at its inventory value; that he would turn in the good will and trade-marks so that the business could be capitalized at its real value, as compensation for Joslin's efforts and success in organizing such a corporation; and that he would personally loan to Joslin $5,000 to enable him to take a portion of the stock in any new corporation to be organized. Mr. Weeks testified:

"My ambition to get out of the business was what prompted me to sell the business. I felt that at that time I was making a great sacrifice in so doing. My relations with Mr. Joslin were the very pleasantest. Doubtless, that had much to do with the matter of my offering him this opportunity as against other men in our employ. Undoubtedly, this friendship had much to do with the price named in the option I gave him. I think it was my suggestion that the name Coronet Corset Company should be perpetuated, and very naturally I had an ambition in that I had made a success of the business."

After getting this option on the Jackson plant and concern, Mr. Joslin, believing the business and accessories of the Hastings concern to be a valuable adjunct to the corset business, took an option on that business at the inventory value of equipment and merchandise. Negotiations followed, all of which, as well

as the subscriptions for the preferred stock, were based upon these options, which were fully understood by all of the subscribers. Defendant Jarvis and others went to Jackson to investigate that concern and its product, before subscribing. They were so impressed with the project that they interested a large number of other Grand Rapids people in the proposition. It was understood that the new company was to be capitalized upon the basis of the actual value of the property turned over under the options, with which the option prices had nothing to do. The incorporators knew the option prices and values of the businesses. Prior to the executing of the articles, several meetings of the incorporators were held. On December 14th, several of the incorporators had a meeting in the office of Clapperton, Owen & Hatten, in which the entire matter was discussed in detail, beginning with the options held by Mr. Joslin. The values of the property, the amount of stock, and methods of payment, were all discussed and fully understood. All knew that the company to be organized was to deal with Joslin through his options. They believed that the values of these properties were many times greater than the purchase price which Joslin was paying for them. It was proposed that the common stock should pay for the intangible property and a part of the tangible property, since all were to be utilized by the new company, $44,000 of the preferred stock was to be paid in cash, and $6,000 in property. Finally, the articles were drafted and signed. Article 7 is as follows:

"The amount of common stock actually paid in is the sum of seventy-five thousand dollars, all of which has been paid in property, an itemized description of which, with the valuation at which each item is taken, is as follows, viz.:

"The following described property now situate in the city of Jackson, Michigan, used in or incident to

the business of manufacturing and selling of corsets and other kindred articles and accessories thereto, which business for many years last past has been and at the date of the transfer of said property to this company was owned and actively operated as a going concern by the Coronet Corset Company, a corporation of the said city of Jackson, Michigan, viz.:

"The miscellaneous machinery and appliances, including 70 sewing machines used in and connected with said business; the steam plant consisting of engines, boilers, pumps, and other equipment connected therewith; the machinery, equipment, materials and supplies constituting the printing plant of said company; the office fixtures of every kind and nature; all the general equipment connected with the handling of the stock, material and output of said company and business, and all shafting and other miscellaneous articles of every kind and nature connected with said business; the following registered trade-marks used in connection with the sale of the output of said business, viz.: La Fillette, Colonial, Filrone, La Blanchette, B/C Flexibone, Flexo-Waldo, Coronet, La Crossine, Her Ladyship, and C. C. Co., Jaxon, the mailing lists and customers' lists connected with said business; together with the corporate name and good will of said established business valued at sixty thousand dollars.

"Also the property and assets of every kind and nature used in or in connection with the business of manufacturing and selling corsets and other accessories, which for several years last past and at the date of transfer thereof to this company, was owned and actively operated as a going concern by W. G. Wright at the city of Hastings, Michigan, under the assumed name of P. Schultz & Company, consisting of all the machinery, equipment and fixtures of every kind connected with said business, including a registered trade-mark 'The Just Wright,' used in connection with the output of said business, together with the trade and good will of said established business, of the value of fourteen thousand dollars; two letters patent of the United States, numbers —— and ——, of the value of one thousand dollars.

"All of the above-described property and established business of said above-described going concerns,

namely, the Coronet Corset Company of Jackson, Michigan, and P. Schultz & Company of Hastings, Michigan, of the total value of seventy-five thousand dollars, heretofore sold by said respective companies, has been taken over and is to be continued and operated as one going concern by this company in the said city of Grand Rapids, Michigan.

"The amount of preferred stock actually paid in is the sum of fifty thousand dollars, of which forty-four thousand dollars has been paid in cash, and six thousand dollars has been paid in other property, an itemized description of which, with the valuation at which each item is taken, is as follows, viz., one hundred sewing machines for manufacturing purposes of the value of six thousand dollars."

Holden Joslin subscribed for all of the common stock. Mr. Weeks and others testified that these properties were worth more than $81,000.

No impartial person can read this record, and especially the testimony of Mr. Weeks, Mr. Wright, Mr. Jarvis, and Mr. Clapperton, without being satisfied that the charges of fraud and misconduct on the part of the incorporators are wholly unsupported by any evidence. The issuance of stock in consideration of property will be presumed free from fraud, unless the contrary clearly appears. Referring to the matter of good will, it may be said that the good will of a business, though intangible, is property, and stock of a corporation issued for such good will is issued for property actually received within the meaning of laws allowing stock to be paid for in property. 4 Thompson on Corporations (2d Ed.), § 3955, and cases cited in notes.

In *White, Corbin & Co.* v. *Jones*, 79 App. Div. 373 (79 N. Y. Supp. 583), where a corporation purchased with its capital stock the property, business, and good will of a firm, it was held that the value of such good will should be taken into consideration in determining whether the property of the firm as transferred to

the corporation had an excessive valuation; and that a member of the firm who was thoroughly conversant with its business and its management was competent to give his opinion as to the value of its good will. Good will is often a valuable adjunct of a firm or corporation where the company has long conducted its business, has a reputation for fair dealing, and has by its conduct attracted customers to it. That favorable impression and disposition may be a component part of its property value, and this element known as good will is held by the courts to be an asset in estimating the value of the property. *Bininger* v. *Clark,* 60 Barb. (N. Y.) 113; *Mitchell* v. *Read,* 84 N. Y. 556; *Boon* v. *Moss,* 70 N. Y. 465. While this is an intangible asset, it is still susceptible of being measured at a money value. *Beebe* v. *Hatfield,* 67 Mo. App. 609; *Burckhardt* v. *Burckhardt,* 42 Ohio St. 474 (51 Am. Rep. 842) ; *Mitchell* v. *Read, supra.*

In *Washburn* v. *Wall-Paper Co.,* 26 C. C. A. 312 (81 Fed. 17), it was said:

"The good will of a business is property, and may have a value independent of any particular locality or any specific tangible property, and stock of a corporation issued for such good will is issued for property actually received, within the meaning of the New York stock corporation law."

In *Bininger* v. *Clark, supra,* it is said that the good will of a business is an important part of its property, and will be protected by a court of equity whenever a proper case arises.

Referring to the claim of $1,500 against the defendant Jarvis, which is for unpaid preferred stock subscribed by him, we think that the circuit judge properly held that all of the incorporators were liable therefor, for the reason stated by him. This holding was the basis of the appeal of defendants Weeks and Kelly.

The defendant Wright has not appealed from the

decree holding him liable for $1,225 due on his preferred stock subscription.

What we have said of good will applies with equal force to patents and trade-marks. We are of the opinion that the description, itemization, and valuation of the property in the articles were a substantial compliance with the terms of the statute, and that the same are conclusive in the absence of fraud.

Attention is called by plaintiff to the sixth subdivision of section 2 of Act No. 146, Pub. Acts 1907, which contains the following (2 Comp. Laws 1915, § 9018):

*"Provided,* that only such property shall be so taken in payment for capital stock as the purposes of the corporation shall require, and only such property as can be sold and transferred by the corporation, and as shall be subject to levy and sale on execution, or other process issued out of any court having competent jurisdiction, for the satisfaction of any judgment or decree against such corporation."

It is urged that no levy of execution can be made upon the intangible property mentioned. The bill made no claim of this kind; but, passing that point, we think that the "other process" referred to in the statute should be held to be broad enough to include decrees and orders of a court of chancery. That patents, trade-marks, and good will can be, and often have been, sold under process of the courts of chancery, must be conceded. The fact that good will cannot be sold separately we do not deem important.

The decree of the court below is in all things affirmed, and no costs in this court will be allowed to either party.

KUHN, C. J., and OSTRANDER, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred. PERSON, J., did not sit.