GEORGE STEINWEG, Doing Business under the Trade Name of the EXPRESS EXCHANGE, Plaintiff, *v.* SAMUEL EPSTEIN and Others, Defendants.

Supreme Court, New York County, February 28, 1934.

*George Robinson* [*Milton Elias Schattman* of counsel], for the plaintiff.

*Karl Propper* [*George S. Levine* of counsel], for the defendants.

GREENBAUM, EDWARD S., Referee. This matter was referred by interlocutory judgment to take and state an account between the parties hereto.

The testimony establishes that on or about May 1, 1925, the plaintiff and the defendant Samuel Epstein started a steamship ticket agency known as Express Exchange at 201 East Eighty-sixth street, borough of Manhattan, city of New York. Both parties devoted their entire time to the business. There was no written agreement between the parties, but they drew equal amounts from the business. The premises were occupied under a written lease, which expired in May, 1930, and a renewal, which expires on April 30, 1935. The business was conducted as aforesaid until February 29, 1932.

At that time the tangible assets consisted of furniture, cabinets, cards, records, customers' names and addresses, and a small cash balance. It is conceded that these physical assets had only a nominal value. The defendant Epstein (hereinafter referred to as the " defendant ") submitted a verified account. This account contains Schedule A, which gives a statement of assets and liabilities of the joint venture as of February 29, 1932, and Schedule B, which shows the amount due from the parties as of that date. In his oral testimony the defendant's accountant corrected certain figures in this account to the extent of $400. However, these corrections do not affect the net amount shown on the schedules, namely, that the business then had a deficit of $3,548.43. The amount due from the plaintiff was $2,233.70 and from the defendant $1,533.33.

The figures in the account submitted by plaintiff do not include profits from an item of payment for advance bookings in the sum of $31,368. According to the testimony, the gross profit from this

amount would be approximately eight per cent, or about $2,500. The net profit would be about $500. This sum of $500 should properly be deducted from the deficit shown above and the accounts of each party credited with one-half thereof, namely, $250. With this exception, I find that the plaintiff's account correctly sets forth the status of the business (exclusive of good will), and that on the 1st day of March, 1932, the plaintiff owed the joint venture $1,933.70 and the defendant owed it $1,283.33.

The real matter in dispute between the parties is whether an item for good will should be included, and, if so, in what amount. The defendant contended that the business had no good will, and argued with considerable force that the interlocutory judgment did not authorize the referee to take proof on this subject. The referee gave the parties an opportunity to clarify this question by availing themselves of the provision in the interlocutory judgment which permitted either party to apply to the court for such further order or judgment as he may be advised. However, neither party made any motion to amend the judgment.

It is my opinion that the interlocutory judgment did not limit the hearings before me to the value of tangible assets, but was broad enough to include taking proof on the item of good will. After directing the dissolution of the joint venture, the judgment provides: " That the plaintiff is entitled to a one-half interest *in the assets thereof* and the defendant to the remaining one-half thereof after payments of its debts and liabilities as of March 1, 1932." (Italics mine.)

Accordingly, over defendant's objection and exception, I received evidence in support of plaintiff's contention that the business had a good will.

No useful purpose will be served by referring to the many definitions of good will. The cases are uniform in holding that identity of location and identity of name are the most common elements of good will. Both of these elements are present in the instant case. During the period in question, the business, although occupying only a small store, maintained continuity of location and name, and showed a substantial increase not only in the volume of business, but in the profits derived therefrom. It spent over $25,000 in advertising. Such a healthily growing business naturally would and did acquire a large clientele. I find that the evidence establishes that the business did have a good will as of March 1, 1932.

This brings us to the problem of valuation. The general rule is to take the average earnings over a fair period of time, deduct interest on invested capital and salaries of the principals, and multiply the resulting average net earnings by a variable factor known as

the " years of purchase." The number of years depends on consideration of all the facts and circumstances surrounding the business. There is no evidence of invested capital, and, therefore, no necessity for considering any deduction for interest thereon.

There is no substantial dispute between the parties as to the receipts and expenses. The books, consisting of single entry records and cards, were produced. The parties and their respective accountants testified and submitted statements prepared by the accountants. The principal difference between these resulted from a segregation of withdrawals. The plaintiff contended that certain of the withdrawals were profits and not salary and the defendant contended that the withdrawals could not be thus segregated and were expenses of the business.

The plaintiff's account showed the following for the period from May 1, 1925, to and including February 29, 1932:

| | | |
|---|---:|---:|
| Receipts from steamship tickets and other income... | $186,207 | 55 |
| Special income................................. | 29,668 | 66 |
| Total receipts............................. | $215,876 | 21 |
| Expenses..................................... | 91,676 | 15 |
| Net profit................................ | $124,200 | 06 |
| The plaintiff conceded that there should be deducted from this amount salaries and commissions received by the parties amounting to.................... | 73,284 | 00 |
| leaving a net profit of............................ | $50,916 | 06 |

| | | |
|---|---:|---:|
| The defendant's account showed the following: | | |
| Receipts...................................... | $186,367 | 22 |
| Expenses..................................... | 173,043 | 46 |
| Net profit................................ | $13,323 | 76 |

| | | |
|---|---:|---:|
| If there is added to the defendant's figure of net profits, namely........................................ | 13,323 | 76 |
| an item of special income amounting to............. | 29,668 | 66 |
| and certain deposits in the National Bank of Yorkville. | 8,430 | 00 |
| the net profits would total........................ | $51,422 | 42 |

It appears, therefore, that the real matter in dispute in determining net profits is whether or not the last two items just referred to should be considered profits or an expense of the business.

In addition to receiving income from the sale of steamship tickets, there were also receipts from other sources. These included payments for notarial and other services rendered, such as preparing documents, receipt of gratuities and free tickets from steamship companies, etc. These moneys were included in the "special income" account. Beginning in May, 1928, withdrawals were made from this source and placed into an account known as Jackson Bros. and in a savings account in the National Bank of Yorkville in the names of the wives of the two parties. Withdrawals were made from these accounts, which were divided equally between the parties. Neither the money deposited in the Jackson Bros. account nor that deposited in the National Bank of Yorkville account were treated by the parties as salaries.

The defendant contends that it is not proper to consider items which were not directly connected with a steamship ticket agency, nor those which resulted from personal services. The interlocutory judgment has directed "an accounting as to *all matters involved in* the steamship ticket agency and money order and foreign exchange business conducted at 201 East 86th Street." It is my opinion that under this broad language it is proper to include not only income received from the sale of steamship tickets and profit on money order and foreign exchange business, but other items which were "involved in" this business. The defendant admitted that it was customary for this type of business to perform general services for its clients.

The proof establishes, as contended by the defendant, that certain of the income was derived from personal services or contacts of the parties. Thus, for example, the defendant secured an account from the Amtorg Trading Corporation, which resulted in a substantial profit for the business. Both parties secured other accounts and rendered personal services. The business operated under licenses from steamship companies which were in the defendant's name, but for a time the plaintiff had a New York State license. All of the expenses in connection with these matters were paid for by the business, and the income derived went into the business. In computing net earnings, deduction is made for the salaries of the parties. This necessarily presupposes that the personal efforts of the parties will be reflected in building up the business. Good will resulting from personal efforts becomes impersonal. It is contributed to by the efforts of the parties. (*Washburn* v. *National Wallpaper Co.*, [C. C. A.] 81 F. 17, 20; *Williams* v. *Wilson*, 4 Sandf. Ch. 379, 380.) It is accordingly my opinion that profits from such services are properly included in the net profits of the business, and that the plaintiff's accountant was justified in segregating these withdrawals and treating them as profits.

Certain items, however, in my opinion, may not properly be included in considering the good will of the joint venture. The first deposit in the Jackson Bros. account was used for margin on a stock transaction, which resulted in a profit of $787.88. The business also received $800 as real estate commissions and $200 as legal fees for drawing wills. The plaintiff himself admitted that these items had nothing to do with a steamship agency business.

There should be subtracted, therefore, from the net

profits of the business as aforesaid, namely........ $50,916 06
the sum of.................................... 1,787 88

Reducing the net profits for the period to....... $49,128 18

Accordingly, I find that said sum of $49,128.18 was the net profits of the business during the period from May 1, 1925, to February 29, 1932. The length of this period is six years and ten months, and the average annual net profits were accordingly $7,189.44.

There is no rigid rule for determining the value of good will. Each case must be decided on its own facts and surrounding circumstances. In order to determine the value of good will, it is necessary to multiply the average net earnings for a fair period of time by a variable factor. (*Von Au* v. *Magenheimer*, 115 App. Div. 84, 86, 87.) I believe that in this case a fair period of time would be the life of the business. Neither the first years nor the years immediately preceding the dissolution would give a fair criterion for average years. After the dissolution, the business conducted on the premises averaged about the same profits as it did in the past. Testimony as to profits after dissolution was received not for the purpose of computing the value of good will based upon subsequent profits, but merely for the purpose of making comparisons and drawing conclusions as to the condition of the business as of the date of dissolution. (*Von Au* v. *Magenheimer, supra.*)

The remaining question is, What is a fair factor to take for the number of years of purchase? I feel that a three-year figure should be used. One of the elements which has led me to this conclusion is that the lease on the premises had approximately three years to run after dissolution. Accordingly, I find that (independently of the effect of plaintiff's competition hereinafter referred to) the value of the good will as of March 1, 1932, was three times $7,189.44, the average annual earnings as aforesaid, namely, $21,368.32.

After the dissolution, the plaintiff opened a similar business across the street at 226 East Eighty-sixth street, where he used the name

" Express Exchange " " for a time." Because the old business still had licenses to sell tickets for German steamship companies, the plaintiff was unable to secure such licenses. This was important in the locality where the business was conducted, because most of the customers were Germans. Nevertheless, the plaintiff competed with the old business, using radio and newspaper advertising. Although plaintiff had the right so to compete, his competition necessarily affected the old business and diminished the value of its good will. The effect of such competition may be considered in fixing the value of good will. (47 C. J. 1179.) Obviously, it is difficult to estimate accurately what deduction should be made on this account. In view of all the circumstances, I feel that such competition had the effect of reducing the value of the good will by one-third. Accordingly I find that there should be deducted from the sum of $21,368.32 referred to above one-third thereof, namely, $7,122.77, leaving a net amount of $14,245.55. The plaintiff's one-half interest therein was the sum of $7,122.77.

This action was originally brought for an injunction, based upon plaintiff's contention that he was the owner of the business. The defendant contends that there is no authority in the referee to make a finding that either party is entitled to be reimbursed for his share of the good will, and that the plaintiff's present position is contrary to his complaint and to certain statements contained in affidavits made by him. The interlocutory judgment directs that the pleadings be amended to conform to the judgment and decrees that a joint venture existed between the parties. It directs the referee to report the amount " due from either party to the other." The scope of the referee's power is, of course, derived solely from this judgment. In order to find the amount due from one party to the other, it is necessary to determine if either party should be paid by the other for his share of the good will. There are no facts before me as to the circumstances under which, or by what right, the defendant succeeded to the business after the dissolution, and I have no power to determine the rights of the parties in that regard. Although it does not appear that the defendant did so wrongfully, nevertheless it is a fact that he did remain in possession of the premises after the dissolution date, and thereafter conducted the business, using the records, equipment, licenses and lease theretofore used by the joint venture. He continued to carry on the business at the same address, with the same telephone numbers, and under the same name. To all outward appearances, it was the same business, except that plaintiff's name was removed from the window. The defendant did not dispute these facts, but objected to the admissibility of all evidence relating to the conduct of the business and

occurrences after the dissolution date. I reserved decision on a motion to strike out such testimony, which is now denied with an exception to the defendant.

The interlocutory judgment provides that the plaintiff was entitled to a one-half interest in the assets of the business as of March 1, 1932. His one-half interest in the business as of that date consisted of his share of the value of the good will, namely, $7,122.77, less the sum of $1,933.70 due from him to the business, leaving a balance of $5,189.07 as the net amount of plaintiff's interest in the joint venture on that date. The defendant is liable to the plaintiff for this amount because he remained in possession of the business, and thereafter conducted it to the exclusion of the plaintiff.

*George Robinson* [*Milton Elias Schattman* of counsel], for the plaintiff.

*Karl Propper* [*George S. Levine* of counsel], for the defendant.

McLAUGHLIN, J. Motion to confirm the report of a referee. I agree with the referee that this business has a good will. The figure arrived at by the referee for the value, *i. e.*, $14,245.55, seems justified by the income, and the referee has amply allowed, in arriving at that figure, for the personal competition of the plaintiff. Plaintiff opened a competing business across the street. The referee has found that, were it not for that competition, the good will would be $21,000. If plaintiff's competition decreased the good will $7,000, then plaintiff must have absorbed that much of the good will. Defendant must be granted an offset for that or the good will has two values. With competition it is worth $14,000 if plaintiff goes into business. The correct way to allocate this good will is at $21,000. Plaintiff's competition was a detriment to the extent of $7,000. Defendant is entitled to an equal right to compete. That leaves $7,122.77 as the good will belonging to the partnership after each had taken out an equal part of the good will. The sum of $3,566.39 must be deducted from the plaintiff's award.

The report is modified by reducing the award to $1,623.31, and, as so modified, the report is confirmed. Settle judgment.