RODNEY B. HORTON, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

EILEEN H. HORTON, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket Nos. 20610, 20611.   Promulgated July 27, 1949.

*L. L. Gambill, Esq.,* for the petitioners.
*Donald P. Chehock, Esq.,* for the respondent.

144

OPINION.

BLACK, *Judge*: We have but one issue in these proceedings, and that is whether payments received by the petitioners in the years 1942 and 1943 pursuant to the terms of a contract of October 1, 1941, constitute ordinary income, as the Commissioner has determined, or capital gain resulting from the sale of good will, as the petitioners contend. Section 29.22 (a)–10, Regulations 111, relating to the sale of good will, is printed in the margin.[1] There is no issue as to the amount of in-

---

[1] SEC. 29.22 (a)–10. SALE OF GOOD WILL.—Gain or loss from a sale of good will results only when the business, or a part of it, to which the good will attaches is sold in which case the gain or loss will be determined by comparing the sale price with the cost or other

come received under the contract and petitioners concede that the payments had no cost basis.

The contract of sale between petitioner and Masquelette provided for three separate classes of payments designated in the contract as (A), (B), and (C). (A) consisted of $2,500 paid in cash. The testimony at the hearing was that petitioner's furniture and fixtures had a depreciated cost at the time of sale of approximately $2,500 and that the purchaser agreed to pay that amount for these tangible assets. This payment was made in 1941 and is not in issue here. (B) was a provision for three payments of $416.66 for each of the months of October, November, and December, 1941. Petitioner testified that these payments were for his personal services in helping the purchasers to get started in the business, introducing them to petitioner's old customers, and other related matters of that kind. Petitioner testified that these amounts were returned as ordinary income in 1941. As in (A), these payments under (B) are not in issue here. (C) was a provision for percentage payments to continue for a period of five years, monthly from October 1, 1941. It is these percentage monthly payments made to petitioner in 1942 and 1943 which are in issue.

Petitioners claim these payments were made as part of the purchase price of the good will of the accounting business which petitioner was conducting at the time of sale under the name of Horton & Bixler, along with petitioner's covenant not to compete for a period of six years. Petitioners contend that the covenant not to compete accompained the transfer of a going business and had the function primarily of assuring to the purchaser the beneficial enjoyment of the good will which it acquired and is not severable from good will so as to allocate to this covenant not to compete any separate portion of the purchase price. He cites *Aaron Michaels*, 12 T. C. 17.

It is well settled that if, in an agreement of the kind which we have here, the covenant not to compete can be segregated in order to be assured that a separate item has actually been dealt with, then so much as is paid for the covenant not to compete is ordinary income and not income from the sale of a capital asset. *Estate of Mildred K. Hyde*, 42 B. T. A. 738. On the other hand, where the covenant not to compete accompanies the tranfer of good will in the sale of a going concern and it is apparent that the covenant not to compete has the function primarily of assuring to the purchaser the beneficial

basis of the assets, including good will. (See sections 29.111–1, 29.113(a)(14)–1, and 29.113(b)(1)–1 to 29.113(b)(3)–2, inclusive.) If specific payment was not made for good will, there can be no deductible loss with respect thereto, but gain may be realized from the sale of good will built up through expenditures which have been currently deducted. It is immaterial that good will may never have been carried on the books as an asset, but the burden of proof is on the taxpayer to establish the cost or other basis of the good will sold.

enjoyment of the good will which has been acquired, the covenant is regarded as nonseverable and as being in effect a contributing element of the assets transferred. *Toledo Newspaper Co.*, 2 T. C. 794; *Toledo Blade Co.*, 11 T. C. 1079; *Aaron Michaels, supra.*

In the instant case we have found, after a consideration of all the facts, that the percentage payments which were to be made under the contract are severable as between good will and the covenant not to compete and that 50 per cent of such payments was made in consideration of good will transferred and 50 per cent was made in consideration of the covenant not to compete for a period of six years from October 1, 1941.

It is respondent's argument in his brief that all of these percentage payments should be allocated to the covenant not to compete because, as he argues, the covenant not to compete was in conjunction with personal services and not in conjunction with the sale of good will. We do not agree with this contention. We think the contract shows clearly that a part of the percentage payments was to be made in consideration of the purchase of good will. However, that fact does not prevent us from allocating the purchase price between good will and the covenant not to compete, if the facts permit us to do so, and in the instant case we think the facts do permit such an allocation and we have made it. That good will was being sold by the seller and purchased by the buyer seems clear from the contract. The first two paragraphs of the contract read:

(1) Horton agrees to sell, and Masquelette agrees to buy, upon the terms and conditions hereinafter set forth, the business and assets hereinafter specifically mentioned, of said firm of Horton and Bixler (all of which are now owned by Horton) free and clear of any and all encumbrances, liens and indebtedness of whatsoever nature, to-wit:

(A) The good will of said firm of Horton and Bixler, including the right to the exclusive use of the firm name of Horton and Bixler within the State of New Mexico, which firm name Masquelette may use or not, at its option, but in any event, Horton agrees not to use any such trade name at any time within The State of New Mexico or adjoining states, in connection with the practice of accounting.

In "Words and Phrases," vol. 18, p. 561, this recital of the meaning of "good will" appears:

Lord Eldon, in *Cruttwell* v. *Lye*, 17 Vesey, 335, said: "The 'good will' which has been the subject of sale is nothing more than the probability that the old customers will resort to the old place." " 'Good will' has been defined as 'all that good disposition which customers entertain towards the house of business, identified by the particular name or firm, and which may induce them to continue giving their custom to it.' * * * That it is property is abundantly settled by authority." *See* v. *Heppenheimer*, 61 A. 843, 846, 69 N. J. Eq. 36, quoting *Washburn* v. *National Wall Paper Co.*, 81 F. 17, 20, 26 C. C. A. 312, 315.

In the instant case the contract from which we have already quoted shows plainly that the seller thought he was selling, among other things, the good will of his accounting business, which he was operating under the name of Horton & Bixler. The purchaser certainly thought it was buying good will and agreed to pay for it. We agree that good will was a part of the assets transferred, and that payment was made for it. Good will is a capital asset and any gains resulting from the sale thereof are capital gains. *Aaron Michaels, supra.* In the instant case we do not have the task of determining the cost basis of the good will sold, because petitioner concedes that he had no cost basis for the good will.

In accordance with our findings of fact, it is held that 50 per cent of the percentage payments which petitioners received in the taxable years should be taxed as capital gains from the sale of good will and 50 per cent should be taxed as ordinary income received because of a covenant not to compete.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

DISNEY, *J.*, dissenting: I can not agree with the majority opinion in so far as it recognizes good will as a factor in a sale by a certified public accountant of his business. It seems well established by the books that no good will grows out of personal efforts and ability. Thus, in *In re Martin's Estate*, 33 N. Y. S. (2d) 81, the estate of an attorney was suing for value of good will and it was held there was none. In *Magee* v. *Pope*, 112 S. W. (2d) 891, it was likewise so held in the case of a physician. In *Master* v. *Brooks*, 117 N. Y. S. 585, it was held that there was no good will as to the business of a revenue attorney. It is true, of course, that some people will go back to a place of business even after the death of the principal figure there, merely for lack of any idea of where else to go and out of habit, but any such tendency seems so rare and of such small importance, in the case of a professional man, as not to be recognizable as vendible good will. Moreover, if a man's business is such that he must take an examination set by the state, there would appear to be public policy against his transmitting "good will" growing out of his abilities, to any degree which should be recognized for tax purposes. *Aaron Michaels*, 12 T. C. 17, as to laundry business, is not to the contrary, and the *Toledo Blade Co.*, 11 T. C. 1079, of course involved a newspaper business, as did *Toledo Newspaper Co.*, 2 T. C. 794, so that they offer no logical help on this question. In *E. C. O'Rear*, 28 B. T. A. 698, we said that a lawyer did

not have capital gain in receiving, when he formed a partnership with two other attorneys, an amount "due to the conceded excess value of good will and unearned fees of said O'Rear put into the firm" over what the other attorneys put in. We said that the attorney's reputation as an able lawyer attached to his person; he could not transfer it. We recognized this rule in *D. K. MacDonald*, 3 T. C. 720. I would adhere to it. I therefore respectfully dissent.

HILL and TURNER, *JJ*., agree with this dissent.