KINGSTON *v.* NICHOLS.

BANKRUPTCY — TRUSTEE — CORPORATIONS — LIABILITY OF STOCK-
HOLDERS—CREDITORS.

In a suit by a trustee in bankruptcy of a corporation on
behalf· of its creditors against certain individuals and
stockholders for an accounting involving liability alleged
to have been incurred by defendants in connection with
the organization and the issuance of stock of said cor-
poration, the finding of the court below that there
was no liability on the part of defendants, *held,* justified
by the record.

Appeal from Kent; Brown (William B.), J. Sub-
mitted January 11, 1922. (Docket No. 80.) Decided
March 22, 1923.

Bill by George B. Kingston, trustee in bankruptcy
of the Grand Rapids Motor Truck Company, against
Fred I. Nichols and others for a discovery and an
accounting. From a decree dismissing the bill,
plaintiff appeals. Affirmed.

*Fred M. Raymond* (*Taggart & Kingston,* of coun-
sel), for plaintiff.

*Travis, Merrick, Warner & Johnson, Wicks, Fuller
& Starr, Butterfield, Keeney & Amberg, Charles B.
Blair, Clapperton & Owen, Carroll, Kerwin & Hollway,
Mark Norris,* and *G. A. Wolf,* for defendants.

MOORE, J. This case has been in this court before;
see *Grand Rapids Trust Co.* v. *Nichols,* 199 Mich. 126.
In the opinion handed down it was held that a trustee
in bankruptcy represented not only the bankrupt but
certain creditors mentioned in the opinion, and that,

if the averments made in the bill of complaint were sustained in a trial upon the merits, the plaintiff would be entitled to a decree. After the opinion was handed down, answers were filed by various defendants in which different claimed defenses were made, and Mr. Kingston, the plaintiff herein, was made trustee. A trial was had upon the merits. So large an amount of evidence was put in that it requires upwards of 2,000 printed pages to contain it. The chancellor filed a very carefully prepared opinion from which we quote freely as follows:

"The plaintiff herein, as trustee, brings suit to recover from the defendants certain sums claimed to belong to a 'trust fund' for which it is alleged the defendants are liable growing out of conditions leading to and connected with the organization and the issuance of stock, preferred and common, of the Grand Rapids Motor Truck Company, a corporation.

"For many years an organization has existed in the city of Grand Rapids known at different times under the names of board of trade, chamber of commerce and association of commerce. The organization was composed of public spirited and patriotic citizens of the city of Grand Rapids, who worked in common and without compensation to build up and advance the industrial, economic and civic conditions of the city. In 1911, as in other years, the organization had a committee composed of one hundred of its members which was known as the 'industrial committee,' or the 'committee of one hundred of the association of commerce.' The duties of this committee were along the line of increasing and strengthening industries of the city. The organization always had a salaried secretary, and in 1911 the secretary was Mr. Martin C. Huggett. One of the duties of such secretary was to locate and bring to the attention of the association of commerce and assist in bringing to Grand Rapids new and desirable institutions. For some time it had been rumored in the city that the furniture industry, a woodworking industry, was opposed to metal working industries coming to Grand Rapids, the alleged reason being that the metal

working industries paid higher wages than the wood-working industries, and that to bring metal working industries here would increase the price of labor generally. While this rumor was denied by the furniture men, yet it became persistent, and so in refutation of such rumor, the members of the association of commerce, including furniture men, bankers, office men, business men, professional men and others having learned of the public benefits derived from the automobile industry in other cities in Michigan, solely for civic purposes, endeavored to bring to Grand Rapids some branch of the automobile industry.

"In 1907, Lembert W. Coppock, living at Marion, Ind., a mechanical engineer, assembled a motor truck, and a company called the Coppock Company was organized to manufacture and sell such truck. This organization operated about two years and then new capital was brought to the company, and at the same time (1909) the Coppock Company was reincorporated under the name of the Decatur Motor Car Company, moving to Decatur, Ind., at that time. This last company discontinued making trucks and engaged in making passenger automobiles, continuing therein for a year and upwards. When the reorganization was effected, Mr. Coppock, who was connected with the Coppock Company, did not remain with the Decatur Motor Car Company. In 1910, Mr. Coppock brought out a new truck, which promised success as a marketable proposition. In the spring of 1911, the Decatur Motor Car Company was reorganized and new capital invested therein, and the Decatur Motor Car Company then arranged with Mr. Coppock to return to the company, bring with him his new truck plans, and the company then took up the manufacture and sale of such new truck and continued therein until about the time the Decatur Motor Car Company conveyed its assets to the Grand Rapids Motor Truck Company.

"In 1907, Mr. Coppock had invented a gasoline engine primer, a device calculated to materially aid in starting gasoline engines, which device would, in a simple, single and easy effort, inject forcibly a certain quantity of gasoline into the head of each cylinder, thereby causing the engine to start upon a slight turn of the engine with the crank, and at times

causing it to start upon pressure of the battery button.

"Upon the first reorganization of the Coppock Company, this primer device was transferred to the Decatur Motor Car Company. Upon the assembly of the second truck undertaken to be manufactured at the last reorganized Decatur Motor Car Company, a patent upon a certain other invention was applied for and claimed by Coppock, being a patent upon the method of suspension of the radiator in a more advantageous placing of the engine upon the chassis, giving a more even distribution of the load to be carried upon the truck. Upon the reorganization of the Coppock Company into the Decatur Motor Car Company it was arranged that M. E. Brackett should become the manager of the new company, which position he accepted and held during the existence of the Decatur Motor Car Company.

"In the summer of 1911, the Decatur Motor Car Company was involved financially, and it became necessary for the company to obtain new money in order to continue doing business. M. E. Brackett, manager of the Decatur Motor Car Company, was a cousin of Mr. Martin C. Huggett, secretary of the association of commerce of Grand Rapids. The necessities of the Decatur Motor Car Company and Mr. Brackett's relationship with Mr. Huggett brought Mr. Brackett to Grand Rapids to seek financial aid for the Decatur Motor Car Company, and under escort of Mr. Huggett, Mr. Brackett was brought favorably into contact with and before members of said committee of one hundred, looking to the enlistment of capital from Grand Rapids men and a reorganization and removal of the Decatur Motor Car Company to the city of Grand Rapids and under a Grand Rapids name.

"Mr. Brackett on different occasions before the committee of one hundred, made statements of his claims and representations as to prospects of the Decatur Motor Car Company, its success, and the benefits which would be derived by the city of Grand Rapids should the Decatur Motor Car Company be brought to this city. Such claims and proposals of Mr. Brackett appeared favorable to the committee, and it was decided that Mr. E. Alfred Clements, who was

then president of the association of commerce, together with Mr. Walter Shultus, a certified public accountant, should go to Decatur to investigate regarding the Decatur Motor Car Company. On November 24, 1911, Messrs. Clements and Shultus went to Decatur and on November 25th, obtained a so-called inventory and saw the plant of the concern, made inquiries around the town and at the bank about the concern, rode upon the truck, and returned and made verbal report of their findings. From this time until January of 1912, nothing was done in regard to the matter, and then Mr. Brackett came to Grand Rapids and endeavored to have the proposition taken over at once by the Grand Rapids men, stating that the proposition of the Indiana concern must be accepted without delay or it would be withdrawn. Upon suggestion and under directions of Mr. Brackett, a plan was outlined for organization of a new corporation to take over the Decatur Motor Car Company and establish an automobile industry in the city of Grand Rapids. It was Mr. Brackett's plan that subscriptions to stock for new money to be raised, in Grand Rapids in the sum of $100,000 be taken, he proposing that if $100,000 of cash be raised in Grand Rapids, that $50,000 in cash would be raised by him among those interested in the company in Indiana.

"An attempt was made to get such subscriptions in Grand Rapids, resulting in but a few subscriptions in small amounts being obtained and with considerable effort. It was then asserted by Mr. Brackett this plan was too slow and indefinite and the matter must be closed with haste or the deal would be off. He then proposed that a better and quicker plan would be to have a certain number of Grand Rapids men underwrite the sale of $100,000 of the preferred stock and that if they would do so, he would assume to sell $50,000 worth of preferred stock among those interested in the Indiana concern, and he stated that as soon as the company was organized, the stock would easily and quickly sell to the public, and that those subscribing to such underwriting would only be required to take such amount of stock as they wished to hold and that the balance would be quickly and easily sold to the public; that such underwriting of the sale of the stock would allow the new company to

be organized and proceed to business without delay.

"Thereupon it was consented to by several men, who had taken interest in the matter, that an underwriting be undertaken, to which 20 men would be asked to subscribe, each underwriting $5,000 of preferred stock of a corporation to be organized. A so-called underwriting was prepared, and Mr. Fred I. Nichols, a business man of the city, was first to sign such underwriting. Mr. Nichols then assisted with others in getting others to sign the underwriting.

"Mr. Brackett was the manager of the Decatur Motor Car Company, and he proposed to continue as manager in the Grand Rapids concern to be organized. Mr. Nichols, enthused by and relying upon the statements made by Mr. Brackett, had been active in the efforts to organize the new company, his activities being solely and only for the purpose of establishing an automobile industry in the city of Grand Rapids, that the city and its inhabitants might be benefitted thereby. Mr. William F. McKnight, a lawyer of the city (who) had shown some interest in the proposed organization together with others who signed the underwriting did so as public spirited men and patriotic citizens of the city.

"On the night of February 21, 1912, and without notice to any of the Grand Rapids men, M. E. Brackett, who was a director and the manager of the Decatur Motor Car Company and who had personal knowledge of the financial condition of the company and the value of its property; William J. Vesey, a director of the Decatur Motor Car Company, a financier of Decatur, Indiana, an officer in the bank at which the Decatur Motor Car Company did business in Decatur, and who held stock in the company and had helped to finance the company on two prior occasions, and who knew the financial condition of the company and the value of its property; and John I. Taylor, a director of the Decatur Motor Car Company, a capitalist of Boston, who had invested large sums of money in the Decatur Motor Car Company and who was familiar with the conditions attending the operation of the company and the values of the property of said company—these three men came from Indiana to Grand Rapids, and on the morning of February 22, 1912, they called several of the signers of the underwriting to the

rooms of the association of commerce for the purpose of organizing the proposed company.

"At this time (February 22, 1912), Mr. Nichols and Mr. McKnight were both out of the city, having no notice of any intention on the part of anyone to attempt to organize a company on that day or on any other particular day.    Mr. Charles O. Smedley, an attorney of Grand Rapids, was called to the association of commerce rooms and there met these three men from Indiana and several Grand Rapids men interested in the organization, and Mr. Smedley was requested to prepare articles of association for the proposed corporation.

"Thereupon Mr. Smedley, accompanied by Messrs. Brackett, Vesey and Taylor, went to the office of Mr. Smedley where he prepared the proposed articles of association for the corporation, with the assistance of Brackett, Vesey and Taylor, in the matter of the description of the property proposed to be transferred to the new corporation and the actual value thereof.

"Later in the day, on February 22, 1912, and after the articles of association had been prepared, seven persons signed and acknowledged the articles, including Messrs. Brackett, Vesey and Taylor.    No notice was given of any meeting for the organization of this company to any person to be held on February 22d, and no waiver of such notice was signed at the time of the meeting or at the time of the signing of the articles of association on that day, and all that was done on that day by way of organization was without notice and without waiver of notice on the part of any organizer of the proposed corporation.

"The first information Mr. Nichols had of the attempt to organize the company was obtained from a newspaper item which he saw several days later while he was still out of the city.    Upon arriving in the city, Mr. Nichols immediately interviewed others interested in launching the enterprise, and after some investigation, he expressed positive disapproval of the organization, refused to have anything to do with the organization, and he referred to Mr. Brackett, in the presence of Mr. Brackett, in very uncomplimentary language and declared that he would have nothing to do with the enterprise.    Mr. Nichols while out of the city at a later date, also sent a telegram to a meeting

of persons who had signed the underwriting in which he declared that he would have nothing to do with the enterprise; he charged that Mr. Brackett had failed to do as he agreed to do as indicated by the so-called underwriting, and that the values of the Decatur Motor Car Company's tangible property were not as represented, and that he would have nothing further to do with the matter of the organization of the new company and that he would so advise his friends, who had signed the underwriting.

"Immediately upon the statement being made by Mr. Nichols opposing the organization of the company, a special committee from signers of the underwriting was appointed to investigate the charges made by Mr. Nichols. This special committee caused to appear before it Mr. Brackett and Mr. Shultus and had before it available documents, and after making a thorough investigation of the matter, the committee reported favorably to the claims of Mr. Brackett, and their favorable report was made in good faith and accepted by the organizers of the new company in good faith, and the effort to complete the organization was continued in good faith.

"On February 22, 1912, Brackett, Vesey and Taylor gave to Mr. Smedley the details as to the property described in the articles of association and the value thereof, and these three men (Brackett, Vesey and Taylor) each signed and made oath before a notary public to an affidavit in writing attached to the articles of association, as required by Act No. 146 of the Public Acts of 1907, stating 'that they are three of the organizers of the Grand Rapids Motor Truck Company, whose articles of association are hereto attached; that they know the property described in article 7 of said articles of association and taken in payment for capital stock, and that the same has been actually transferred to such corporation and further say that said property is of the actual value of $368,256.'

"Messrs. Brackett, Vesey and Taylor had been for some time prior to the making of this affidavit, and then were connected with the Decatur Motor Car Company and owned stock in the company; were directors of the company, and by experience and direct contact with the company knew and had means of knowing the exact financial condition of the Decatur

Motor Car Company and the value of its assets. No Grand Rapids citizen had any knowledge as to the value of the property of the Decatur Motor Car Company, and no means of knowledge were available to the Grand Rapids men as to the value of the Decatur Motor Car Company, other than as told to them and as represented by these three men who made this affidavit upon the articles of association. These defendants also were reliably informed that Brackett, Vesey and Taylor had accurate knowledge as to the facts which they made oath to in this affidavit, and had no reason for suspicion that such affidavit was not truthfully made.

"The property turned over to the organization in payment for stock was itemized and its value sworn to by three of the organizers as required by law, and a reasonable and sufficient investigation under all the circumstances of this case was made by the Grand Rapids men as to the character and value of the property taken by the new company in payment for capital stock, and it was accepted in the best of good faith by the Grand Rapids men who were organizers of the new company.

"John I. Taylor and M. E. Brackett each subscribed to the articles of association as trustee, and it appears that they were trustees for persons in Indiana who held stock or were interested in the property of or as creditors of the Decatur Motor Car Company, and that those stockholders and interest holders had an arrangement with said Taylor and Brackett of a private and personal character for the holding of their stock and interests in said Decatur Motor Car Company in the corporation to be organized, and as such trustees and in their own right the said Taylor and Brackett were each to take from the new company such an amount of stock as would represent the holdings and interests of those whom they each represented in the stock and property of the Decatur Motor Car Company, including their own holdings. The arrangement which was made and entered into between Brackett as trustee and Taylor as trustee for those who held interests, or rights in the Decatur Motor Car Company, which it was proposed to bring to Grand Rapids and merge into a new company, was known only to themselves and was of no interest to the

Grand Rapids men. The Grand Rapids men did know that whatever interests were claimed by the Indiana men, such interests were to be held by Bracket and Taylor as trustees, and the Grand Rapids men knew that as such trustees, Brackett and Taylor, according to their affidavit in the articles of association, paid for common stock in said new company in property which was held by the Decatur Motor Car Company as shown by the articles of association, of the value of $296,628, and for which there was issued to said trustees 2,966.28 shares of common stock.

"In accordance with the declared terms of the articles of association and as shown by the affidavit attached thereto of Brackett, Vesey and Taylor, who were known to have positive knowledge as to said property and its value, the said common stock was fully paid for and duly issued to said trustees and held by them as third parties, as private holders of said common stock, with full right to dispose of it as they wished to do. For reasons known to Brackett, he indulged the plan of giving with each share of preferred stock purchased and paid for, a, share of the common stock which was issued to him as trustee and held by him as trustee, being fully paid for. This he had a right to do so far as the corporation was concerned. The articles of association showed this stock to be paid for in full. The affidavit made by three organizers in compliance with the law showed that the stock was paid for in full, and no stockholder or organizer defendant in this suit had any knowledge that the property included in the articles taken in payment for said capital stock, either common or preferred, was of less value than as stated in the articles of association, and no defendant herein had any notice or suggestion that there was any fraud, misrepresentation or deceit in the fixing of the value of the property as stated in the articles of association. The testimony in the case does not establish the claim of the plaintiff that the patent No. 888,226 complained of herein was not worth the amount stated in said articles of association for which it was taken in payment for capital stock at the time of the transaction. The most dependable testimony in the case upon the value of that patent, at the time of the transaction is to the effect that, had the patent had legal protection

and had goods been manufactured and placed upon the market in accordance therewith, without delay, that the patent was worth as much or in excess of the amount as stated in the articles.

"There was no plan considered by the Grand Rapids people or these defendants in which it was contemplated by any of the terms of the organization that bonus stock was to be given with any purchase. It does appear that Brackett as trustee, voluntarily and without authority on the part of the stockholders (with one exception) mailed and delivered to the Grand Rapids men who paid for preferred stock an equal amount of the common stock held by him as trustee, but such common stock had been fully paid for to the company and was then held by Brackett as trustee in the interest of third parties, and in the transfer of such common stock, the company had no right or interest. If the men who owned this common stock wished to enthuse or stimulate the putting up of new cash to bring life and financial sustenance to this concern by giving this stock, which was fully paid for, that was the business of the individual, and no concern of the corporation.

"The articles of association were originally drawn by Mr. Smedley on February 22, 1912, at a meeting of some of the underwriters. At that time the underwriting was in the hands of Mr. Smedley, and was by him used as a source of information for the names of subscribers and shares of stock to be subscribed by the incorporators. In these articles of association as originally drawn, article 5 fixed the par value of a share of stock at $100. Article 6 stated the amount of preferred stock subscribed to be $221,628. Article 7 stated the amount of preferred stock actually paid in to be $221,628, and that $150,000 of that sum was paid in in cash. Article 10 stated the names of the stockholders and the number of shares of stock subscribed for by each stockholder, giving among others the names of Fred I. Nichols, Edward Lowe, W. Millard Palmer, William H. Gay and W. R. Shelby as subscribers to the articles of association, and gave the number of shares subscribed for by each as 50 shares. The articles so drawn February 22, 1912, were signed and acknowledged in the form as originally drawn and without

change, being signed and acknowledged by different subscribers thereto on different days, viz., February 22, February 28, March 1, and March 5, 1919 (1912).

"These five men, Messrs. Nichols, Lowe, Palmer, Gay and Shelby, did not sign or acknowledge the articles of association and took no part in the organization of the company. They did sign the underwriting. After the 5th day of March, 1912, and before the articles were filed March 14, 1912, the articles of association as signed and acknowledged were changed without any knowledge or authority from or on the part of any subscriber to said articles, the changes therein, in part, being as follows: The names of Messrs. Nichols, Lowe, Palmer, Gay and Shelby were struck out from article 10, and the number of shares after each name, being 50 shares after each name, was struck out, thereby reducing the amount of preferred stock subscribed for 250 shares, and the amount paid in for preferred stock was thereby reduced $25,000. By striking out the subscription of 250 shares, the amount opposite the five names so stricken, the amount paid for preferred stock was reduced $25,000, and the amount of preferred stock subscribed as stated in said article 6 as being $221,628, was changed to $196,628. In article 7 the amount stated as being 'actually paid in for preferred stock of $221,628, was struck out, and the amount of $121,628 was inserted in its stead, and in said article 7 the amount as stated as having been paid in in cash for preferred stock, as being $150,000 was struck out and $50,000 was inserted in its place and stead.

"These changes were made in the articles after the articles had been signed and acknowledged by all of the subscribers thereto, and without the knowledge or consent or acquiescence of any of the subscribers to said articles, and particularly without the knowledge or consent of defendants, Hollister, Brown or Wilmarth. After these changes and alterations had been made in the articles, and without any notice or information of such alterations being given to any of the defendants herein, they were filed by Mr. Smedley, the attorney, in the office of the secretary of State, and county clerk of Kent county. After the corporation was thus launched, several of the defendants, among whom were Hollister, Brown and Wilmarth

attended no meeting of the stockholders or board of directors, and refused to make any payments to the corporation on account of preferred stock or otherwise, except that defendant Wilmarth at one time paid $1,000 with express reservation and without prejudice to his rights. The fact that these alterations or changes, or any of them, were made in the articles after the articles had been signed by defendants, Hollister, Brown and Wilmarth and the other defendants, did not come to their knowledge and they never had any information that the articles had been changed until the facts in connection with the alterations were developed upon the trial of this cause by the testimony given by witnesses in court. Except as above stated with regard to defendant Wilmarth, neither of defendants Hollister, Brown or Wilmarth ever participated in the corporation in any way or recognized any liability on account of signatures to the articles of incorporation or the so-called underwriting.

"After the organization of the company and in February and March of 1912, the property of the Decatur Motor Car Company, which was turned over and paid in to the Grand Rapids company, was moved to Grand Rapids by and at the expense of the Grand Rapids company, and an attempt was made to operate the business. No real opportunity was ever had for developing the plans for the operation of the company, or of the success and utility of the truck to be manufactured, or the value or benefit to be derived from the patent which was a part of the capital of the organization, for the reason that no sufficient test was made of the truck, and for the reason that no attempt was made to develop, manufacture and place upon the market the patent described in the articles of association. Because of lack of funds, inefficiency in the management, failure to produce goods for the market, an expensive selling force having been organized and maintained without goods to sell, from which profits could be realized, thereby dissipating the working capital of the company, the new company never really became a going concern, and, after lingering, was adjudicated a bankrupt, July 7, 1913.

221—Mich.—44.

"The plaintiff alleges liability on the part of the defendants in classifications as follows:

"(1) Defendants who signed the underwriting but who did not sign the articles of association, and who have paid nothing and received no stock, their alleged liability being placed solely upon the underwriting.

"(2) Defendants who signed the underwriting and who signed the articles of association, but who have not paid the amount of the underwriting or subscription to the articles, being an alleged liability based on both the underwriting and the subscription to the articles of association.

"(3) Defendants who did not sign the underwriting nor the articles of association, but who subscribed for preferred stock before the organization of the Grand Rapids company while the underwriting was being circulated.

"(4) Defendants who did not sign the underwriting nor the articles of association, but who acquired preferred stock after the organization of the Grand Rapids company and who received common stock from Brackett, as trustee, at the time they received their certificates for preferred stock and for which common stock they gave no consideration.

"(5) Defendants who received common stock from Brackett, as trustee, at the time certificates of stock were issued to them for preferred stock subscribed for on the articles of association, and for which common stock they paid nothing to the company.

"As to liability of signers to the underwriting:
"The underwriting is as follows:

"'We the undersigned hereby underwrite at par and guarantee the sale of all unsold portions of $100,000 preferred stock of the Grand Rapids Motor Truck Company, *pro rata*, according to the number of shares set opposite our respective names. It being understood that the control of the directors of the said company shall be vested in the Grand Rapids investors until the common stock shall have paid six per cent. dividend. It is understood that none of the money received from the sale of said $100,000 preferred stock shall be paid over to the company until the plant of the Decatur Motor Truck Company shall have moved and located its factory and office in Grand Rapids. In consideration of this agreement Mr. M. E. Brackett agrees to sell $50,000 of preferred stock at par in addition to the above $100,000 on the same basis. It is understood that this shall not be binding until the entire $100,000 of preferred stock is underwritten.'

"Much comment was indulged during the trial and argument of the case as to whether there were conditions precedent in this underwriting necessary of performance on the part of Brackett and the Decatur Motor Truck Company before any obligation was imposed upon the subscribers to the underwriting to pay the amount subscribed, and also as to whether the full amount of $100,000 was legally subscribed, making the payment a legal obligation going to the new company; that one of the subscribers to the underwriting, viz., the Grinnell-Row-Althouse Company was a corporation which could not legally sign the underwriting, and without its subscription thereto, the full amount to be subscribed necessary to make the underwriting binding was not subscribed.

"It appears from the underwriting that M. E. Brackett agreed and undertook to sell for cash, either as a condition precedent to the payment of the subscriptions or as a condition concurrent with payment of the subscriptions, shares of preferred stock in the sum of $50,000; also that the Decatur Motor Truck Company, at its own expense, would move and locate its factory and offices from Indiana to Grand Rapids before the subscriptions to the underwriting were payable to the company to be organized; also the underwriting required the sale of $100,000 preferred stock for cash on the part of Grand Rapids men, and the sale of $50,000 preferred stock for cash by Brackett, representing the Indiana interests, all to be sold for cash and money received therefor to be placed in the treasury of the new company thereby assuring each signer of the underwriting that when the new Grand Rapids company would be organized the company would have cash in the treasury in the sum of $150,000 received from the sale of $150,000 worth par value of preferred stock of the new company.

"It appears from the testimony that on February 22, 1912, when the articles of association were drawn, Mr. Smedley advised the members present that the subscription of Grinnell-Row-Althouse Company, a corporation, to the underwriting was not legal and was of no legal force or effect; and it also appears that Mr. Frank G. Row, a stockholder in the corporation, signed the articles of association with the intent of taking over the stock intended to be underwritten for

that corporation on the underwriting. However no attempt was made to complete the underwriting, and on the face of the underwriting the full amount of $100,000 was never legally subscribed, and therefore was never binding upon the subscribers thereto. The fact that Mr. Row subscribed to the articles did not make him a subscriber to the underwriting. It is not the theory of the plaintiff herein that Mr. Row is liable upon the underwriting, but it is the claim of plaintiff that Mr. Row is liable because he signed the articles of association.

"Under the undisputed testimony in the case, the Decatur Motor Truck Company did not move and did not attempt to move or locate its factory and offices in Grand Rapids as agreed by the underwriting, but on the contrary, the moving was done entirely by and at the expense of the Grand Rapids company which was subsequently organized. Mr. Brackett never sold for cash any of the $50,000 preferred stock which he agreed in the underwriting to sell; this $50,000 preferred stock was to be sold by Brackett 'on the same basis,' undoubtedly meaning that the stock was to be sold in advance, but the money to be held and not to be paid over until the happening of such event as made the $100,000 payable to the company to be organized.

"The court finds that there are conditions precedent to be performed by Brackett and the Decatur Motor Truck Company before a liability falls upon the subscribers to the underwriting, and that those conditions have never been performed and have never been attempted, and because of failure to obtain legal underwriting of the whole $100,000 of preferred stock as contemplated by the underwriting and of the conditions precedent which were never performed, there never was any legal obligation or undertaking on the part of any subscriber to the underwriting to pay the amount alleged to be underwritten or any part thereof.

"However, under the undisputed facts in the case, it is immaterial to the determination of the liability of the alleged underwriters whether or not the conditions of the underwriting are binding, or whether conditions precedent existed or were performed. A serious infirmity of the underwriting is that it does

not in any particular attempt to fix the scope, terms or details sufficient to identify any organization attempted to be based thereon.

"Assume that the underwriting intended the organization of some specific corporation. If the underwriting is not sufficiently specific as to detail to determine or identify the corporation intended or referred to in the underwriting, we are justified in referring to the articles of association that were drawn on February 22, 1912, and signed and acknowledged by a majority of the signers of the underwriting, for the essentials of the organization of the corporation intended by the underwriting.

"The articles of association as originally drawn state in article 6 that the amount of preferred stock subscribed was $221,628. In article 7 it was stated that the amount of preferred stock actually paid in was $221,628, of which sum $150,000 was paid in in cash. Article 10 stated the names of the stockholders and the number of shares subscribed by each, giving among other names, the names of Fred I. Nichols, Edward Lowe, W. Millard Palmer, William H. Gay and W. R. Shelby, and gave the number of shares subscribed for by each as 50 shares. These articles as drawn were signed and acknowledged in the form as drawn and without change. These articles as originally drawn must be taken as a positive declaration of the corporation intended by the underwriting.

"These articles were materially and vitally changed. In paragraph 6 the amount of preferred stock subscribed was changed from $221,628 to $196,628. In paragraph 7 the amount stated as actually paid in for preferred stock was $221,628, which sum was stricken out and $121,628 inserted in its stead. In paragraph 7 the amount stated as paid in in cash was $150,000, which amount was stricken and $50,000 inserted in its place and stead. In paragraph 10 the names of Nichols, Lowe, Palmer, Gay and Shelby were stricken, and the number of shares set opposite each of said names was also stricken.

"It requires no argument upon the proposition that the corporation organized by the articles as filed was not the corporation which would have been organized had the articles been filed as originally drafted. This

discussion does not involve minor changes; but the changing of articles of association by striking $100,000 cash out of the amount of cash actually paid in and in the treasury at the time of the filing of the articles, is such a change as completely destroys the whole foundation of the organization.    The filing of the articles in the form as filed, was not an attempt to organize the corporation contemplated by the underwriting.    The underwriting required the expense of moving the Decatur plant to Grand Rapids to be paid by the Decatur company.    The underwriting required the sum of $150,000 to be paid in in cash into the treasury of the company before any operation should begin.    The articles of association as originally drawn followed the underwriting in regard to the cash paid in for preferred stock.    The names of five substantial citizens were stricken from the articles of association, names which were upon the underwriting and men upon whom others relied in signing and acknowledging the articles.

"It follows that because the company intended to be organized under the underwriting was not organized, there never was any liability on the part of any subscriber to the underwriting.

"Inasmuch as no corporation was organized as contemplated by the underwriting, there would be no liability on the part of any subscriber to stock in the corporation contemplated by the underwriting prior to February 22, 1912.

"The underwriting was no part of the articles of association.    No creditor represented by the plaintiff company had any knowledge of or reliance upon this underwriting, and therefore, no liability would attach by reason of reliance thereon.

"It follows that there is no liability on the part of defendants because of having signed the underwriting; and further that there is no liability on the part of subscribers for stock in the corporation intended by the underwriting prior to February 22, 1912.

"Liability of stockholders who signed the articles of association:

"Prior to 1903, the statute did not require the organizers of a corporation to itemize or describe in the articles the property turned over as capital stock, neither did the statute require the value of such prop-

erty to be stated in the articles.    The organizers of
a corporation were left practically to their own de-
vices as to representations to be made as to what com-
prised the capital stock.    Under the law as it then
stood, the general rule was that a creditor was en-
titled to the full benefit of the stockholder's contract
as he has made and published it in subscribing, ex-
ecuting and filing his subscription to the stock of the
company.    There was no record available to a creditor
other than the articles of association to which the
creditor could look for information as to the property
of the corporation.    The incorporators were left to
their own devices as to representations of capital stock,
and the law held them responsible to the amount of
their subscriptions as indicated by the terms of the
articles subscribed by them.

"Much criticism was made of the harshness of this
rule as applied to organizers who innocently became
victims of enthusiastic promoters, and in 1902, Mr.
Justice GRANT in writing the opinion of the Supreme
Court in *McBryan* v. *Universal Elevator Co.*, 130
Mich. 121, made the following observation:

"'If the statute required the articles of association to state
the property put in as capital stock, it might be held that
creditors should deal with the corporation at their own risk.
But until the legislature sees fit to enact such a provision, in-
corporators must be required to act in good faith in placing
values upon property put in as a part of paid-up capital stock,
and the right of those dealing with the corporation to rely upon
these solemn statements must be preserved.'

"Undoubtedly this language of Justice GRANT in-
spired the legislature in 1903 (Act No. 232) in re-
vising the laws for incorporation of manufacturing
companies, to enact into law the following:

"'Such capital stock may be paid in, either in cash or in
other property, real or personal; but where payment is made
otherwise than in cash there shall be included in the articles
an itemized description of the property in which such payment
is made, with the valuation at which each item is taken, which
valuation shall be conclusive in absence of actual fraud.'

"The fact that the legislature acted upon the sug-
gestion of Mr. Justice GRANT in enacting this legis-
lation clearly indicates that the purpose of this new

law was to place some responsibility upon the creditor, as he says: 'That creditors should deal with corporations at their own risk,' so far as the articles state the facts, and to the extent that the creditor was burdened with responsibility in the same measure the organizer was relieved from responsibility. Surely there was no intent on the part of the legislature by this change in the law to give the creditor added rights or security, because under the prior law the creditor was fully protected. It must be assumed that the intent of this new law was to define certain duties on the part of incorporators and when they complied therewith, then the responsibility was to be shared by the creditor to the extent and so far as the details of the articles gave him information as the law required.

"Under the law prior to 1903 no itemized statement of the property paid in for capital stock was required in the articles, and there was no opportunity afforded the creditor to inform himself as to the property of the corporation and therefore no responsibility rested upon the creditor to investigate the nature of the assets, because the articles showed it to be cash, worth one hundred cents on the dollar, according to representations as to capital stock as shown by the articles.

"As is stated, in 1903 the legislature passed Act No. 232, requiring an itemized statement of the property and the value of each item, thereby giving to the creditor, who is about to extend credit to the company, the means of knowledge as to the property and assets of the company, together with the alleged value of the property paid in. With this information always available the creditor is required to know what the articles disclose as to the assets of the company and he assumes the responsibility so to do, and he must govern his extension of credit accordingly. * * *

"The legislature in 1907 amended the law of 1903 by passing Act No. 146 in which is contained the following:

"'Such capital stock may be paid in, either in cash or in other property, real or personal; but where payment is made otherwise than in cash there shall be included in the articles an itemized description of the property in which such payment is made, with the valuation at which each item is

taken, which valuation shall be conclusive in absence of actual fraud: * * * And *Provided further,* that there shall be made and attached to any such articles of association an affidavit by at least three of the organizers of such corporation, that they know the property described in such articles of association and that the same has been actually transferred to such corporation, and that such property is of the actual value therein stated.'

"It is clear that the legislature in adding this paragraph by amendment intended to definitely fix and determine the individual responsibility and liability for the fixing of values in articles of association.   In practically every corporation some of the organizers are familiar with the property paid in and know the value of it, and some of the organizers have no information whatever as to the property or its value, and they have no means of knowing or finding out about it (as in the case at bar) other than to inquire of their associates in the organization.   By requiring three organizers to swear to the value of the property (and these three may require others to join them in the affidavit and the responsibility thereby incurred if they wish) the creditor upon making his investigation of the company preliminary to giving credit, is afforded the names of the men who state under oath that they know the property and its value, and surely such men as make oath to the value of property are directly charged with knowing that their affidavit is true, and the creditor knows the extent of the assumed responsibility of the stockholders as he investigates the articles.   *   *   *

"In the case at bar it is conceded, as well as being proven, that the defendants are entirely free from any connivance or guilty knowledge as to the values placed upon the property paid in for capital stock.   The only persons connected with the enterprise who had knowledge as to the property paid in or its values made oath, by affidavit attached to the articles, that they knew the property and its actual value to be as therein stated.   The Grand Rapids people had every reason to believe these men, Mr. Brackett being a cousin of Mr. Huggett, and, being sponsored by Mr. Huggett, he participated in the esteem in which the Grand Rapids men held Mr. Huggett, and there was

nothing to cause the organizers to doubt the veracity of these three men who swore to the affidavit. A reasonable investigation was made by sending Mr. Clements and Mr. Shultus to Decatur, and the defendants had no information that should have put them on their guard against this organization. Their absolute good faith in the project is further established by the fact that they signed the articles and paid their money. Messrs. Brackett, Vesey and Taylor, who signed the affidavit in the articles showing the property and value of the property paid in, or either of them, are not defendants in this suit. If there is liability on the part of the organizers because of false statement of value in the property paid in, they have assumed such liability. The statute requires them to know about the value of the property and to make oath as to the 'actual value' of the property. The creditors should look to those who have assumed legal liability, if any liability exists under the articles of association. No defendant made affidavit as to value of property and no defendant had any knowledge as to overvaluation of property in the articles, and every organizer or stockholder who is made a defendant is wholly innocent and without fault in the organization of this company.

"For the reason that, under the law, organizers who do not make affidavit as to values of property paid in, and who have no information which would place a reasonably careful man on his guard as to the values as stated in the articles, are not liable to creditors of a corporation in case of over-valuation of property paid in for capital stock, no recovery can be had against any of the defendants because of over-valuation of property paid in for capital stock. However, no over-valuation as claimed by the plaintiff has been established by legal evidence in the case.

"Liability on common stock:

"It is conceded that common stock was issued by Mr. Brackett as trustee, to each of the defendants who paid for preferred stock and in the same amounts as certificates of preferred stock, and that nothing was paid to the company by the defendants for the common stock. The plaintiff claims that the common stock issued to defendants by Mr. Brackett was 'bonus stock' and was issued without consideration to

the company, and therefore, the persons who received such common stock are liable to plaintiff for the par value of the common stock so received by them.

"The defendants claim that the stock was not issued without consideration; that it was paid for in full to the company as is fully shown by reference to the articles of association; that the stock was paid for in full by property turned over to the company, and was issued to Mr. Brackett as trustee, who held the stock interests and property interests of certain persons who were interested in the Decatur Motor Truck Company, which property he turned over to the company in consideration for the common stock, that when Mr. Brackett issued the common stock to these defendants he was a third party holder of said stock, which had been fully paid for to the company by property being paid in as is shown by the articles, and that Mr. Brackett had all lawful right to dispose of the common stock standing in his name.

"The plaintiff admits that actual fraud must be shown to have existed on the part of defendants in order to recover for this common stock. The defendants assert and contend that no fraud of any kind, actual or constructive, has been shown or impugned to them in the issuance of the common stock; defendants insist that not only has plaintiff failed to show any fraud, but that defendants have shown beyond all doubt that no fraud, either actual or constructive, existed on the part of these defendants or any of them.

"The bringing of the industry to Grand Rapids and the organizing of a new company was not a scheme or plan of any Grand Rapids person. No Grand Rapids man was interested in the scheme other than as a public-spirited enterprise to help the city. Mr. Brackett, the manager of the Indiana concern, saw to it that he was to become the salaried manager of the new concern. The entire scheme was promulgated and promoted by Messrs. Brackett, Vesey and Taylor and their Indiana associates. The defendants who received this common stock from Brackett as trustee, paid their money for the preferred stock without any expectation of compensation or reward other than as earnings of the company would be paid to them upon their investment.

"No fraud, actual or constructive, has been shown to exist and, therefore, the valuation as shown by the articles is conclusive. The common stock issued by Brackett as trustee to the defendants was not bonus stock in any sense as used by counsel for plaintiff. ('Bonus stock,' so-called, is stock issued by the company to individuals for which no consideration was given to the company.) This common stock was fully paid for in property and, therefore, cannot be called 'bonus stock.' The plaintiff claims that the property paid in for common stock was not of the value as stated in the articles, and, therefore, the common stock was not paid for. If there was a failure in consideration for the common stock to the company that would not make the stock 'bonus stock' but rather the action would be for fraudulent issuance of stock. Such liability would not extend to an innocent person who had procured the stock from one claiming to own it and to whom the company had issued the stock. In this case Brackett claimed to have paid in full for this common stock to the company by a transfer of a patent in question and as stated in the articles, and for value as sworn to by three organizers. The patent was transferred to the company and the stock was issued to Brackett as trustee, in consideration therefor. In the absence of actual fraud the valuation sworn to on the articles as to the value of the patent is conclusive, and, as no fraud has been shown on the part of any of the defendants, it must be accepted as stated on the articles that the common stock was fully paid for to the company when issued to Brackett and Taylor as trustees, and that Mr. Brackett and Mr. Taylor had the legal right to dispose of the stock which was under their control as they saw fit to do.

"Value of patent:

"The fraud claimed by plaintiff herein is the alleged over-valuation of a certain patent conveyed to the company as property valued at $249,629.02, and referred to in paragraph 7 of the articles of association as patent number 888,226. No other over-valuation or misrepresentation of property conveyed to the company is complained of by plaintiff. The plaintiff's right to recover against any person upon common stock depends entirely upon whether there

was actual fraud in the assertion in the articles as to the value of this patent.

"It is academic to say that a patent has no inherent value. Its value is not to be compared with the value of wheat or potatoes. The most valuable patent, having the greatest potentialities will avail nothing unless it shall be given legal protection from infringement, and unless it shall be capitalized and manufactured into finished product and marketed in quantities sufficient to give profitable returns, and it must be utilized before the patent shall be succeeded by a more useful, more practical or more economic invention, serving the same or a better purpose. Protection, speed in placing product on market and magnitude of business give value to a patent.

"The latest remarks on the subject of patents in the Michigan Reports may be found in the case of *Dodge* v. *Ford Motor Co.*, 204 Mich. 496 (3 A. L. R. 413), where Mr. Justice OSTRANDER says:

"'Subscriptions to capital stock may be paid for in property valued by those associating. It may be that a patent is contributed which, until exploited, has only an estimated potential value—no selling value—but after exploitation, would sell for more than the maximum limit fixed for capital stock.'

"A patent may have some real potential value which would produce large profits if placed upon the market in large quantities. Yet, if you delay in placing the article on the market until a new and different article shall be produced which will produce better results with less expense than the first patent, all value to the first patent has passed.

"In 1911 and 1912, the automobile world was demanding some device to assist in the starting of gasoline engines. The primer device known as patent number 888,226 had possibilities at that time and should have been taken advantage of. There is testimony in the case tending to show that the primer device was worth more than it was valued at in the articles. No attempt was made to place the device upon the market presumably from the lack of money. Under all the testimony in the case it cannot be said that the patent referred to in the articles was overvalued.

"The court finds that the testimony given in the case by Brackett, Vesey and Taylor is inconsistent, is void of the indicia of truthfulness and their efforts are so barren of veracity and so clearly establish a culpable disregard of their oath to tell the truth, that no consideration can be given to their testimony.

"Liability on preferred stock of those who signed articles of association, and have not paid for same:

"As has been stated, Messrs. Nichols, Lowe, Palmer, Gay, and Shelby, who signed the underwriting, neglected or refused to sign the articles of association as originally prepared and submitted for signature. Their names were scheduled in the articles of association, each for $5,000 of preferred stock, thereby showing that they were to be organizers of the company and to take $25,000 of preferred stock. Upon their neglect or refusal to sign the articles and after all the organizers had signed and acknowledged the articles, the names of these five persons and the subscriptions of $5,000 each were stricken from the articles, and the following alterations were made in the articles without the knowledge or consent thereto of any subscriber to the articles of association, viz.: The amount of preferred stock subscribed as stated in article 6 was changed from $221,628 to $196,628, a reduction of $25,000. In article 7 the statement as to the amount of preferred stock actually paid in was reduced from $221,628 to $121,628, and in the same article the amount of such stock stated as having been paid in in cash was reduced from $150,000 to $50,000. These changes were made in the articles after the same had been signed and acknowledged by all of the subscribers who signed and acknowledged the articles, and without knowledge on the part of any subscriber to the articles, and particularly without knowledge on the part of defendants Hollister, Brown and Wilmarth, who had not paid the amount of stock by them subscribed. After these alterations were made in the articles of association they were filed by Mr. Smedley, the attorney, in the office of the secretary of State and the county clerk. After the corporation was thus launched defendants Hollister, Brown and Wilmarth attended no meetings of stockholders or directors and refused to make any payments to the

corporation on account of preferred stock subscribed for by them or otherwise, except that defendant Wilmarth at one time paid $1,000 under an express reservation of and without prejudice to his rights. The fact that these alterations were made in the articles, after the same had been signed by these three defendants, did not come to their knowledge until the facts in connection with the alterations were developed on the trial of this cause. Except as above stated with regard to defendant Wilmarth, none of these three defendants ever participated in the corporation in any way or recognized any liability on account of signatures to the articles of incorporation or the so-called underwriting.

"It is clear, as has already been shown, that the corporation intended by the original draft of the articles of association, and as signed by the defendants herein, is not in any sense the corporation organized by the filing of the articles as altered. It is settled law that the corporation organized under articles which have been altered without the knowledge of the subscriber cannot recover from the subscriber the amount of his subscription to the articles. The question here is whether or not the plaintiff herein as trustee for creditors, stands in a different position toward the subscriber to the articles than would the corporation in seeking to recover upon these subscriptions to the articles which have not been paid.

"In *Hughes* v. *Manufacturing Co.*, 34 Md. 318, it is said:

"'The capital stock having been changed after subscription from $50,000 to $150,000 without assent or subsequent acquiescence on the part of the subscriber, he is discharged from all liability on account of his subscription.'

"In *Bucher* v. *Railroad Co.*, 76 Pa. St. 306, it is said:

"'It was therefore a matter of grave import to the subscriber that he should know to what his name was to be appended. Moreover, it was doubtless the intention of the legislature that such subscriber should know and carefully consider the paper thus presented for his signature; for these matters involve not merely private rights but also affect the public weal, and hence the parties to them are required to

act with due circumspection and within prescribed lines. It is, therefore, certain that unless Bucher's subscription was attached to the articles of association, with his assent for that purpose, first had and obtained, it was of no force whatever and could not bind him.'

"In *Duchess, etc., R. Co.* v. *Mabbett,* 58 N. Y. 397, it is said:

" 'A signature to an incomplete paper, wanting in any substantial particular, when no delegation of authority is conferred to supply the defect, does not bind the signer without further assent on his part to the completion of the instrument. ⁕ ⁕ ⁕

" 'Whether the preliminary consent is given upon a separate and different paper from that which is to become the articles of association, or whether the paper signed is that which, when completed, is to be the actual articles of association spoken of in the statute, can make no difference; the principle is only that consent is necessary to the making of a contract.'

"In *Felgate's Case,* 2 De G., J. & S. 456 (46 Eng. Reprint 451), it is said:

" 'F. signed the memorandum and articles of association of a company. After signature, but before registration, a sheet of the articles was taken out and a new sheet substituted for it without his privity but with the approbation of the persons then managing the company. There was a conflict of evidence as to whether the contents of the substituted sheet were identical with those of the old one, and whether there was not a material alteration. *Held:* That the articles were not binding upon F., that the articles and memorandum must be taken as together constituting one instrument, and that F. was not a contributory.'

"On page 466:

" 'It was urged for the respondent in support of his contention that the appellant was bound by the articles, that Scott ought to be considered to have been the appellant's agent, and that the appellant therefore was bound by his acts; but even assuming that there was an agency for preparing the deed, which upon the facts of the case seems to be doubtful, the agency must, I think, have determined when the deed was executed.'

"Section 9025, 2 Comp. Laws 1915, provides for

the recording of articles of association in the following language:

" 'Before any corporation organized under this act to operate in this State, shall commence business, the president'shall cause the articles of association to be recorded, at the expense of said corporation, in the office of the secretary of State of this State, and in the office of the county clerk of the county in which such operations are to be carried on.' * * *

"So far as the record in this case discloses, there was no authority, express or implied, in Mr. Smedley to record the articles, either before or after the alterations were made. The law says: 'The president shall cause the articles of association to be recorded.' * * * There is no right, much less a duty, on the stockholder to record articles of association. Consequently, no agency, implied or otherwise, could exist on the part of any person, other than as the law provides, for the recording of the articles. These articles were not filed by authority of law, and the person filing them was not in any sense acting as agent for any subscriber to the articles of association.

"Applying this settled law to the facts in the case at bar, it follows that there is no liability on the part of any subscriber to the articles of association as altered. It cannot be successfully claimed, under the facts of this case, that the articles as altered have been adopted or acted upon affirmatively by either of the defendants Hollister, Brown or Wilmarth, or any other defendant in the case.

"It therefore follows that there is no liability on the part of those defendants who have not paid their subscription to the articles of association.

"It is therefore concluded:

"1. That there is no liability on the part of any defendant under the underwriting or because of having signed the underwriting.

"2. That there was no authority, actual or constructive, in fact or in law, on the part of any defendant in the inception of the company or in its organization, or the issuance of or payment for stock, either preferred or common.

"3. That the common stock was fully paid for, as is shown by the body of the articles of association and

221—Mich.—45.

as verified by the affidavit of three of the organizers of the company as required by law.

"4. That there is testimony to show that the patent in question was worth the amount, or more, for which it was conveyed to the company, as stated in the articles, and the testimony does not establish that its value was overestimated had it been protected by law and had it been manufactured and placed upon the market at that time in a business manner.

"5. That there is no liability on the part of any defendant who subscribed for stock to be issued in the company intended by the underwriting prior to February 22, 1912, because such company never was organized.

"6. That there is no liability for common stock on the part of any defendant who subscribed for stock in the company after the company was organized.

"7. Defendant McKnight purchased stock after the company was known to be in financial straits, and he paid more for the stock, preferred and common, than it was worth on the market at the time it was purchased, and no liability attached because of such purchase of stock.

"8. There is no liability on the part of defendants who signed the articles of association and did not pay their subscription.

"9. There is no liability on the part of any defendant who subscribed for $5,000 upon the articles of association who has paid the sum of $4,235 thereon. Under the facts and circumstances of the case the theory running through the underwriting, the articles of association, and the management of the concern, it was understood that stock sold in the Grand Rapids district should be considered as a reduction of the amount of stock liable to be paid for by the subscribers, as the stock sold by the company reduced a subscription of $5,000 of stock to $4,235.

"10. There is no liability on the part of any defendant for common stock. No common stock was issued to any defendant from the common stock of the company. There was no bonus stock in the organization of the company. There was no fraud, subterfuge or connivance on the part of any defendant in the or-

ganization of the company for the issuance or payment for the stock, either common or preferred."

A decree was entered in accordance with the opinion. The plaintiff brings the case here by appeal. No one else has appealed.

Counsel for the appellant in a brief of 242 pages, and in a supplemental brief of 79 pages, discuss in detail their claims as to wherein the decree is wrong. Their contentions are summarized as follows:

"1. That the law contemplates and requires that stock be actually paid for, and that the so-called 'good faith rule' is the law in Michigan as to the property taken in payment for stock and that any over-valuation of property taken in payment for stock which under the circumstances of the particular case cannot be brought within the 'good faith rule' constitutes actual fraud.

"2. That when the fraud consists of the over-valuation of property taken in payment for stock the fact that the articles of association show the stock of the corporation to be fully paid is not conclusive against the plaintiff as the representative of creditors unless the general creditors have full actual knowledge of all the material circumstances surrounding the issue of the stock and the actual value of the property transferred in payment for the stock.

"3. That a liability may exist although as between the corporation and the stockholders, the stock issued, received or contracted for by the stockholders was fully paid.

"4. That it is not necessary to allege or prove an actual subscription for stock or actual subscription to the articles of association in order to establish the liability of a stockholder.

"5. That the stockholders of the corporation who subscribed or contracted for part of the original issues of stock and came in on the 'ground floor' are bound by what they knew, or should have known in the exercise of ordinary diligence as to the value of the property transferred in payment of the stock they received; and the fact that original stockholders who come in on the 'ground floor' received stock for which

they paid nothing is enough to put such stockholders upon their guard and requires them to make inquiries regarding the facts.

"6. That an actual subscription for stock is not a necessary incident to liability and therefore, it is unnecessary to allege an actual subscription and that a stockholder who receives a part of an original issue of stock which is not full paid stock with the knowledge that it is not full paid stock becomes liable to creditors notwithstanding the fact that he signed no subscription for the stock.

"7. That fraud may consist of reckless disregard of the truth or falsity of the fact stated.

"8. That the 'good faith' rule applicable to cases of this class, requires something more than utter ignorance of the readily available facts.

"9. That the acceptance of a certificate of stock from the treasurer of a corporation for which nothing is paid is sufficient to charge a stockholder with notice of the bonus character of the stock received.

"10. That acceptance of bonus stock without any inquiry whatever as to the facts, is not 'good faith' with relation to corporate creditors."

The pivotal questions as we view the case are questions of fact and not of law. It may be well to notice that some of the creditors are Mr. Suttles, receiver of Coppock Motor Company, about $13,500. Old Adams County Bank, over $16,500. Mr. Taylor, amount not clear but in excess of $13,700, none of whom could have relied upon the common stock being paid for in cash, and it does not appear that any of the creditors extended credit because they supposed the common stock was paid for in cash.

In the bill of complaint it is stated "that the patent right, valued at $249,628.02 in the articles of association, was part of the assets of the Decatur Motor Car Company, of Decatur, Indiana, all of which were purchased by the Grand Rapids Motor Truck Company at $43,000, and that no value whatever was placed upon said patent by the Decatur Motor Car Company in such sale; that the value of the patent was purely imaginary and speculative, and that the value of

$249,629.02 placed upon said patent in the articles of association was recklessly excessive and extravagant and not an actual good faith valuation, and was a fraud and attempt to evade the requirements of the statutes of Michigan; that the common stock received by the defendants was actually part of the original issue of stock in the corporation and was only issued to and held by Brackett as trustee 'as a man of straw;' that no consideration passed from Brackett, as trustee to the Grand Rapids Motor Truck Company for the common stock issued to him, amounting to $296,628, and that said stock was subscribed for and issued to the said M. E. Brackett, trustee, as a subterfuge and for the purpose of consummating a plan whereby a share of bonus common stock was subscribed for."

To sustain these averments, plaintiff relies largely upon the testimony of William J. Vesey, John I. Taylor, and M. E. Brackett.

When the Grand Rapids Motor Truck Company was organized these men subscribed and swore to an affidavit on the back of the articles of association reading:

"State of Michigan ⎫ ss.
"County of Kent.   ⎭

"William J. Vesey, John I. Taylor and M. E. Brackett, being duly sworn, do depose and say that they are three of the organizers of the Grand Rapids Motor Truck Company, whose articles of association are hereby attached; that they know the property described in article 7 of such articles of association and taken in payment for capital stock, and that the same had actually been transferred to such corporation; and further say that said property is of the actual value of $368,256, and further say not.

(Signed)    "WILLIAM J. VESEY,
"JOHN I. TAYLOR,
"M. E. BRACKETT."

Mr. Brackett was cross-examined in part as follows:

"*Q.* Is that signature 'M. E. Brackett' yours?
"*A.* Yes, sir.

"*Q*. Well, calling your attention to the statement made in the affidavit by the affiants including yourself, you say that you know the property described in article 7 of such articles of association and taken in payment for capital stock.   That is the property that was then owned by the Decatur Motor Car Company, was it not?

"*A*. Yes, sir.

"*Q*. Were you familiar with that property at that time?

"*A*. I was.

"*Q*. And you also swore the same has been actually transferred to such corporation, that is, to the Grand Rapids Motor Truck Company.   Was that true—was that transfer actually being made at that time?

"*A*. Why, I presume the records would show whether the transfers were made or not.

"*Q*. But it was all a part of the plan of completing the transfer of the organization of the new company at that time was it not?

"*A*. Yes, sir.

"*Q*. Practically, all those things were done contemporaneously were they not?

"*A*. To the best of my knowledge, yes.

"*Q*. A further statement is made in this affidavit by you; you swear that said property is of the actual value of $368,256.   I ask you whether you made that statement at that time in good faith and for an honest purpose?

"*A*. Why, I knew at that time as everybody else knew that had anything to do with this transaction, either the Grand Rapids stockholders, Judge Vesey, or John I. Taylor, or the attorney who had charge of this affair, or Mr. Smedley, who took the oath, that the patent price contained in there was put in there for reasons that the attorney said that it must go in if we organized according to the laws of the State of Michigan.   So far as these other items mentioned in here—materials, cars, tools, machinery and so forth —there is no question of a doubt but what those items were absolutely and as near correct as they were able to be made.

"*Q*. The attorney does not seem to have signed this affidavit, or have sworn to it; the affidavit is signed

by Mr. Vesey and Mr. Taylor and yourself.   And the affidavit does not refer in particular to the patent, but it refers to the property that is mentioned in article 7, and says that it is of the actual value of $368,256.   Taking into consideration that this was a going concern that was being transferred to the Grand Rapids Motor Truck Company, and that it had an established business with brilliant prospects, did you think at the time that the valuation of $368,256 was an excessive or false valuation?   *   *   *

"*A.* I don't think it was an excessive valuation; no, sir.   I think that the property, the developed car itself, was worth, if you had nothing but the truck chassis, and without any patent, tools, machinery, equipment or anything else, was worth every dollar of it; and I think so yet.

"*Q.* Well, what I am trying to get at is just what your belief was at that time, Mr. Brackett, and the answer you gave me a moment ago left me somewhat in doubt.   I will change the form of the question. When you stated in this affidavit that the property which was transferred by the Decatur Motor Car Company to the Grand Rapids Motor Truck Company, and listed in paragraph 7, was of the value in the aggregate of $368,256, had you any intent in making that statement to lie about it, or to cheat and defraud the Grand Rapids stockholders - or any subsequent creditors of the Grand Rapids Motor Truck Company?

"*A.* All of the records of the transaction show that we did not.   I did not intend to cheat or defraud any of these people that you have referred to.   The statement that the property in the aggregate was of the value of $368,256 was made in good faith.   I do not think that $368,256 would have been an excessive price for the Grand Rapids Motor Truck Company to pay for this company if the company had had abundant money for working capital, and had been able to go ahead with this enterprise in the manner which was planned when we came to Grand Rapids.   My judgment was that this property at the time it was transferred to the new corporation, taken as a whole, in view of the fact that it included a going business, was worth the amount stated in my affidavit and more. It is my judgment, as president and manager of that company, that it could have gone ahead and paid large

profits upon the capital stock, both preferred and common. * * * We had what I, as a motor truck man, would call a developed chassis, or in other words a well-developed truck, and an established business, which gave to this business as a whole a valuation that was infinitely larger than we would have been justified in putting on it if we had considered these items merely by themselves as so much iron or steel or office furniture or the patent and other assets that are particularly described in paragraph 7. * * *

"Q. And whether that failure in your judgment was due to any intrinsic defect in the merit of this enterprise as outlined in the articles of association and stated in your affidavit, or whether it was due to the fact that capital was not paid in fast enough, so that you did not have money to conduct the business as planned?

"A. In my opinion the entire cause of failure of the company was because the capital was not paid in promptly as it was intended that it should be when this deal was finally consummated."

Mr. John I. Taylor was shown the affidavit. His cross-examination in part was as follows:

"Q. Is that your signature?

"A. Yes, sir. The signature of M. E. Brackett is undoubtedly his signature. I recall Mr. Brackett and Judge Vesey signing this affidavit with me at the time. I recall that I signed the affidavit, too. When I signed this affidavit I knew that a large amount of money had been expended by the Decatur Motor Car Company in exploiting its business and getting ready to put its trucks on the market. I don't remember any discussion at the time as to the amount that had been thus expended. It was my expectation at that time that this automobile truck concern could if properly supplied with working capital go forward and make large profits. That was my absolute, good faith, belief, when I signed this affidavit.

"Q. Calling your attention to the statement in the affidavit signed by you in which you swore that said property is of the actual value of $368,256, I ask you, Mr. Taylor, whether when you signed and swore to

that statement, you meant to lie about it or tell the truth?

"*A.* Well, I didn't intend to lie about it.

"*Q.* When you said here under oath in this affidavit which you signed, that the property transferred was of the actual value of $368,256, did that represent a good faith belief on your part?

"*A.* Why, no, I should say that I thought the patents were in there rather too high for patents; I don't know anything about that.

"*Q.* Did you intend at the time to put those patents in there at too high a figure in order to mislead the Grand Rapids stockholders or the subsequent creditors of the concern?

"*A.* No, sir.

"*Q.* Or was that simply a matter of judgment upon the part of those interested at the time?

"*A.* Well, that I couldn't say, what it was. It wasn't intended to deceive the people who were coming in in Grand Rapids.

"*Q.* Was it intended to deceive any subsequent creditors of the concern?

"*A.* No, sir.

"*Q.* Have you any reason to believe that Mr. Brackett or Judge Vesey when they signed the affidavit did so with intent to deceive or mislead any Grand Rapids stockholders or subsequent creditors of the concern?

"*A.* No, sir.

"*Q.* You recall do you not, that Judge Vesey and Mr. Brackett assented to those figures wherein the values of the property were stated at $368,256?

"*A.* Yes, sir.

"*Q.* And so far as you know did that represent a good faith belief on their part at the time taking into consideration the prospects of the corporation for future success?

"*A.* As far as I know, yes.

"*Q.* And whether, in your case, in the values which were put upon these properties when they were transferred to the Grand Rapids Motor Truck Company and the new corporation was organized, did you take into consideration the prospects as you viewed them at the time for the success of this newly-organized corporation?

"*A.* Yes, sir.     *   *   *

"*Q.* Did you take into consideration in the values that you put upon the property that it was owned by a going concern which, if supplied with proper working capital and proper management might be able to go ahead and earn large profits?

"*A.* Yes, sir.

"*Q.* As a matter of fact you had enough familiarity with the automobile business at this time, 1912, did you not, to know that there were many concerns in the automobile and automobile truck business which were making huge profits?

"*A.* Yes, sir.

"*Q.* And that many of those concerns had been built up from very small beginnings and with a very small capital?

"*A.* Yes, sir.

"*Q.* That was the truth was it not?

"*A.* Yes.     *   *   *

"When I went into the Grand Rapids Motor Truck Company I went into it in good faith and in the belief that the prospects of the Grand Rapids Motor Truck Company for future success were bright, and without any intent to deceive or defraud any of the Grand Rapids stockholders in this concern or any subsequent creditors of the Grand Rapids Motor Truck Company."

Mr. Coppock, who was the inventor of the device which was patented, was called as an adverse witness. We quote some of his testimony:

"*Q.* Was this primer patent ever the property of the Decatur Motor Car Company that was making pleasure cars?

"*A.* Yes, sir, and I understand it was assigned to them as a part of the assets of the Coppock Company.     *   *   *

"The Decatur Motor Truck Company after its organization, either the latter part of 1909 or early in 1910, commenced immediately to build the truck which I developed at home. I developed the designs at home, and they commenced to build the truck from those designs. That was the same truck that they continued to build all the time they were in existence

down there; the same truck which the Grand Rapids Motor Truck Company continued to build up here.  *  *  *

"Q. From your experience as a motor engineer, Mr. Coppock, you will tell us a little more definitely than you have done, fully, I want you to do it, the utility of this motor starter or priming device?

"A. In those days there was no system of priming a cylinder or a motor prior to starting it by hand, except by taking a small lubricating can or priming can and squirting the gasoline in each individual cylinder by opening up the priming cock, and that brought about the development of a priming device that would work automatically and spray a certain fixed charge of gas into each individual cylinder through the operation of a dial or crank on the dash; it would do that automatically and save the trouble of lifting the hood and priming each cylinder individually; as is done even today.   That was its use and what it was designed for.   Even in later days, when we had electric starters, even today, under certain weather conditions, it is physically impossible almost to start the motor even with an electric starter, without a priming device of some kind, and particularly in motor trucks.   They are used and being used today as largely as they were years ago, some sort of priming device, and it is still important to use something of that description.   This device of mine was a device of the kind that I have just described.   The cylinders could be primed—for instance, there was a set of cams that operated each individual pump; starting from the forward and they would prime in rotation back, or, if the cam happened to be to the left in the rear, it would prime in rotation forward; prime each cylinder individually on every quarter turn of the device.   Its effect on the easy or hard starting of the motor was that the motor could usually be started on a quarter turn, on account of atomizing the gasoline into the cylinders.   That could be done in cold as well as warm weather.  *  *  *

"Q. Whether or not in your judgment this patent on this priming device mentioned in the articles as No. 888,226, was in February, the latter part of February, at the time of the organization of this company,

1912, reasonably worth to this company the sum of $249,699.02?

"*Mr. Bradfield:* Just a minute. I object to the question as being immaterial.

"*The Court:* You may answer.

"*A.* It was, yes, sir."

In this connection it should not be forgotten that the electric starter, as we know it now, was unknown at the time the device mentioned was patented, and a motor starter that would work would be a very valuable adjunct to an automobile motor.

The question of how payment may be made for corporation stock is not a new one in this State. As long ago as the case of *Young* v. *Erie Iron Co.,* 65 Mich. 111, in Justice MORSE'S opinion, it was said:

'There was no concealment of this valuation (the valuation of leaseholds at $422,000, which the incorporators believed to be worth at least $200,000), or their action upon it, and no secret agreements of any kind. It was fully set forth in the articles of association, and in the issue of stock, that the capital was all paid in except $75,000 to be sold, and that such payment consisted of $3,000 in cash, and the transfer of property, which upon inquiry would have been found to be this lease, and that the stock was fully paid up and non-assessable. There was no deception practiced anywhere, and anyone dealing with the corporation had ample means of notice as to the character and value of its capital stock and property."

See, also, *Monk* v. *Barnett,* 113 Va. 635, and *Durand* v. *Brown,* 236 Fed. 609.

Speaking for the court, Justice GRANT in *McBryan* v. *Universal Elevator Co.,* 130 Mich. 111, 121, said in part:

"If the statute required the articles of association to state the property put in as capital stock, it might be held that creditors should deal with the corporation at their own risk."

At the next session of the legislature Act No. 232, Pub. Acts 1903, was passed, reading in part:

"Such capital stock may be paid in, either in cash or in other property, real or personal; but where payment is made otherwise than in cash there shall be included in the articles an itemized description of the property in which such payment is made, with the valuation at which each item is taken, which valuation shall be conclusive in absence of actual fraud."

In 1907 this act was amended so as to require the affidavit of three incorporators. Act No. 146, Pub. Acts 1907, § 2, subd. 6.

In *Brown* v. *Weeks*, 195 Mich. 27, this court quoted with approval the language of Judge McDONALD, who is now a member of this court, as follows:

"The charges of fraud and misconduct on the part of the incorporators of this company are wholly unsupported by any evidence. I am not able to say from the evidence whether there was any very extravagant valuation placed on the property which was turned in by Mr. Joslin to pay for the common stock; but I am satisfied that, if there was, it was due to an honest error in judgment induced by an apparently well-founded enthusiasm as to the ultimate success of the business. It was at least a good faith valuation. I therefore find that there was no fraud in fact or in law, and that therefore no liability attaches to any of the organizers of the corporation, because of the valuation placed upon the property for which the common stock was issued.

"Neither is there any evidence of conspiracy or unlawful purpose in the promotion and organization of the company. And, if there was no fraudulent overvaluation of the property, the common stock was fully paid, and, as it belonged to Mr. Joslin, he had a right to sell it or give it away as he pleased. It follows that there can be no recovery from any of those defendants who purchased preferred stock and received therewith, without cost, 50 per cent. of the amount in common stock."

Justice STONE said further:

"The issuance of stock in consideration of property will be presumed free from fraud, unless the contrary clearly appears. Referring to the matter of good will, it may be said that the good will of a business, though intangible, is property, and stock of a corporation issued for such good will is issued for property actually received within the meaning of laws allowing stock to be paid for in property. 4 Thompson on Corporations (2d Ed.) § 3955, and cases cited in notes.

"In *White, Corbin & Co.* v. *Jones,* 79 App. Div. 373 (79 N. Y. Supp. 583), where a corporation purchased with its capital stock the property, business, and good will of a firm, it was held that the value of such good will should be taken into consideration in determining whether the property of the firm as transferred to the corporation had an excessive valuation; and that a member of the firm who was thoroughly conversant with its business and its management was competent to give his opinion as to the value of its good will. Good will is often a valuable adjunct of a firm or corporation where the company has long conducted its business, has a reputation for fair dealing, and has by its conduct attracted customers to it. That favorable impression and disposition may be a component part of its property value, and this element known as good will is held by the courts to be an asset in estimating the value of the property. *Bininger* v. *Clark,* 60 Barb. (N. Y.) 113; *Mitchell* v. *Read,* 84 N. Y. 556; *Boon* v. *Moss,* 70 N. Y. 465. While this is an intangible asset, it is still susceptible of being measured at a money value. *Beebe* v. *Hatfield,* 67 Mo. App. 609; *Burckhardt* v. *Burckhardt,* 42 Ohio St. 474 (51 Am. Rep. 842); *Mitchell* v. *Read, supra.*

"In *Washburn* v. *Wall Paper Co.,* 26 C. C. A. 312, 81 Fed. 17, it was said:

"'The good will of a business is property, and may have a value independent of any particular locality or any specific tangible property, and stock of a corporation issued for such good will is issued for property actually received, within the meaning of the New York stock corporation law.'

"In *Bininger* v. *Clark, supra,* it is said that the good will of a business is an important part of its property,

and will be protected by a court of equity whenever a proper case arises. * * * "What we have said of good will applies with equal force to patents and trade marks. We are of the opinion that the description, itemization and valuation of the property in the articles were a substantial compliance with the terms of the statute, and that the same are conclusive in the absence of fraud."

See, also, *Courtney* v. *Youngs*, 202 Mich. 384; *Ver Wys* v. *Vander Mey*, 206 Mich. 499; 1 Cook on Corp. (6th Ed.) p. 164.

Without- quoting further from the record, we think the chancellor was fully justified in reaching the conclusion that all of the Grand Rapids defendants acted in the utmost good faith. It was an unfortunate venture for all of them. They never received any return on their investments and ultimately sustained a total loss.

The articles of incorporation were duly filed in the proper office. They were easily accessible to a prospective creditor. They would have informed him of the amount of common stock, to whom issued, and the consideration paid.

Without further discussion we content ourselves with saying that we see no occasion to disturb the decree of the lower court. It is affirmed, with costs to the appellees.

FELLOWS, CLARK, BIRD, SHARPE, and STEERE, JJ., concurred with MOORE, J. WIEST, C. J., concurred in the result.